Jewelle GRESHAM, Individually and on behalf of all others similarly situated, Appellant,

v.

Dr. George CHAMBERS, Individually and in his capacity as President of Nassau Community College, and A. Holly Patterson, Individually and in his capacity as Chairman of the Board of Trustees of Nassau Community College, Appellees.

No. 985, Docket 73-2733.

United States Court of Appeals, Second Circuit.

Argued June 13, 1974.

Decided Aug. 13, 1974.

Judith T. Pierce, New York City (Charles T. McKinney, New York City, of counsel), for appellant.

William S. Norden, Mineola, N.Y. (Joseph Jaspan, County Atty. of Nassau County, Mineola, N.Y., of counsel), for appellees.

Before HAYS and MANSFIELD, Circuit Judges, and BAUMAN, District Judge. *

MANSFIELD, Circuit Judge:

The principal issue raised by this appeal is whether the president of a community college, which admittedly is sub-

ject to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., must, in exercising the power to appoint members of his staff at the level of Associate Dean, use open recruiting as the method of selection. On August 31, 1973, appellant, a black member of the faculty of the Nassau Community College ("the College"), instituted this action under long-standing civil rights laws, 42 U.S.C. §§ 1981 and 1983, in the Eastern District of New York against the President of the College, Dr. George Chambers, and the Chairman of its Board of Trustees, A. Holly Patterson, seeking an injunction restraining the appointment of Ms. Esther Kronovet, a white person, as Associate Dean, on the ground that the President, by selecting her through informal word-of-mouth methods rather than by open and formal recruiting, had precluded appellant from being considered, which allegedly violated her rights. Preliminary relief was denied by Judge John F. Dooling who, after a four-day hearing, at which testimony was taken, made extensive findings in a 65-page opinion. We affirm.

The essential facts are as follows. The College was established by the County of Nassau pursuant to the Education Law of the State of New York, § 6301 et seq., McKinney's Consol.Laws, c. 16. Its President, Dr. Chambers, is admittedly vested with the power to select those persons to be employed as members of his presidential staff which has consisted of nine persons. The College has approximately 450 members of the faculty and 18,000 day and evening students.

In the latter part of 1972 Dr. Chambers and various members of his staff and of the faculty concluded that the College was obligated to comply with Executive Order 11246, which had recently been amended.[1] That Order pro-

* Of the United States District Court for the Southern District of New York, sitting by designation.

1. Executive Order 11246, as amended September, 1972, provides in pertinent part:
   "*Subpart B—Contractors' Agreements*
   "Sec. 202. Except in contracts exempted in accordance with Section 204 of this

Order, all Government contracting agencies shall include in every government contract hereafter entered into the following provisions:
   " 'During the performance of this contract the contractor agrees as follows:
   (1) The contractor will not discriminate against any employee or applicant for em-

vides that a "contractor" (a term which covers all public educational institutions such as the College, 41 C.F.R. § 60–1.-5(a)(4)) [2] must not discriminate against any employee or applicant for employment because of race, color, religion, sex or national origin and that affirmative action programs to implement this objective must be undertaken. Fed.Reg. 41 C.F.R. § 60–2.22(a) provides for the appointment by the contractor of a director or manager of Equal Opportunity Programs, a position generally referred to as "Affirmative Action Officer." [3]

Having concluded that the College was governed by these Federal Regulations, President Chambers took steps to comply. Pending selection and appointment of an Affirmative Action Officer, he designated a member of his staff, Rob-

ert Lukitch, to perform the functions of that office on a temporary or transitional basis. Dr. Chambers had already planned to expand his staff to include a woman as Associate Dean because he believed that more female representation at the administrative level of the College was advisable. At some point he concluded that, by selecting a woman to serve as Associate Dean with the added duties of Affirmative Action Officer, he could achieve his objective and also satisfy the requirements of Executive Order 11246.

In the meantime Mr. Lukitch, through his assistant, asked campus and faculty organizations to assist in formulating an affirmative action plan for the College. In mid-January, 1973, an *ad hoc* Affirmative Action Committee was founded by the faculty, which advised Dr. Chambers

ployment because of race, color, religion, sex, or national origin. The contractor will take affirmative action to ensure that applicants are employed, and that employees are treated during employment, without regard to their race, color, religion, sex or national origin. Such action shall include, but not be limited to the following: employment, upgrading, demotion, or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation; and selection for training, including apprenticeship. The contractor agrees to post in conspicuous places, available to employees and applicants for employment, notices to be provided by the contracting officer setting forth the provisions of this nondiscrimination clause. (2) The contractor will, in all solicitations or advertisements for employees placed by or on behalf of the contractor, state that all qualified applicants will receive consideration for employment without regard to race, color, religion, sex or national origin. (3) The contractor will send to each labor union or representative of workers labor union or representative workers with which he has a collective bargaining agreement or other contract or understanding, a notice, to be provided by the agency contracting officer, advising the labor union or workers' representative of the contractor's commitments under Section 202 of Executive Order No. 11246 of September 24, 1965, and shall post copies of the notice in conspicuous places available to employees and applicants for employment.' "

2. 41 C.F.R. § 60–1.5 provides in pertinent part:

"(4) *Contracts with State or local governments.* The requirements of the equal opportunity clause in any contract or subcontract with a State or local government (or any agency, instrumentality or subdivision thereof) shall not be applicable to any agency, instrumentality or subdivision of such government which does not participate in work on or under 'the contract or subcontract. In addition, any agency, instrumentality or subdivision of such government, except for educational institutions and medical facilities, are exempt from the requirements of filing the annual compliance report provided for by § 60–1.-7(a)(1) and maintaining a written affirmative action compliance program prescribed by § 60–1.40 and Part 60–2 of this chapter."

3. 41 C.F.R. § 60–2.22 provides in pertinent part:

"(a) An executive of the contractor should be appointed as director or manager of company Equal Opportunity Programs. Depending upon the size and geographical alignment of the company, this may be his or her sole responsibility. He or she should be given the necessary top management support and staffing to execute the assignment. His or her identity should appear on all internal and external communications on the company's Equal Opportunity Programs. His or her responsibilities should include, but not necessarily be limited to: . . . ."

that the permanent Affirmative Action Officer to be appointed by him should be a full-time official and that the appointment should be "affirmed," i.e., screened and approved, by it. With this Dr. Chambers disagreed, expressing the intention to appoint a qualified woman, chosen by him in the normal fashion employed by him, to serve as Associate Dean, with duties that would include those of an Affirmative Action Officer.

Dr. Chambers proceeded to consider seven women who might be eligible for the position as he conceived of it. Five were employees of the College. A sixth, Mrs. King, was the wife of a former administrative employee of Nassau, and a seventh, Dr. Esther Kronovet, was the wife of a member of Vice-President Lukitch's staff. In July, 1973, Dr. Chambers, without engaging in public recruiting or obtaining the faculty's approval, appointed Dr. Kronovet as Associate Dean and assigned to her the duty, among others, of formulating an affirmative action plan as required by Executive Order 11246. Dr. Kronovet is apparently well qualified to perform these duties and it is not suggested that if open recruiting had been used she could not properly have been selected by Dr. Chambers in the exercise of his appointing power as President. This lawsuit, however, attacks the method of selection followed by Dr. Chambers. Appellant contends that Dr. Chambers was required to undertake a formal search or open recruitment, which would have enabled her and others to apply and to be considered for the position.

## DISCUSSION

■ At the outset we face the threshold question of whether the district court had jurisdiction over this action. Appellees argue that the suit, insofar as it is based on 42 U.S.C. § 1983, should have been dismissed for lack of jurisdiction for the reason that it is in reality an action against the county, a municipal corporation, which is not a "person" within the meaning of the Civil Rights Acts, see City of Kenosha v. Bruno, 412

U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973); Monroe v. Pape, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), and that the appointment of members of the president's staff is a representative, not an individual, function of the Board of Trustees and of the President, its appointee. See N.Y. Education Law §§ 6301, 6304(1)(b), and 6306. The College, they further point out, has been created by the County of Nassau pursuant to the Education Law, with a nine-member board, five appointed by the Nassau County Board of Supervisors and four by the Governor of New York. This contention must be rejected, however, since the complaint names Dr. Chambers and Mr. Patterson individually, which for jurisdictional purposes is sufficient to preclude the action from being classified solely as one against the county. Cf. Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1943).

There remains a further jurisdictional issue, not raised by appellees, although appellant did anticipate it in her brief. That is whether appellant, before bringing this civil rights suit under 42 U.S.C. §§ 1981, 1983, was required to exhaust her administrative remedies before the Equal Employment Opportunities Commission, 42 U.S.C. § 2000e-5. Although the issue was not raised by the appellees, we are duty bound to consider it. John Birch Society v. National Broadcasting Co., 377 F.2d 194, 199 (2d Cir. 1967); Rule 12(h)(3), F.R.Civ.P.

■ In support of the position that *jurisdiction should have been refused for non-exhaustion of administrative remedies* it may be argued that to permit Title VII to be bypassed through an independent lawsuit under § 1981 would frustrate the purpose of Title VII, which was to establish an inexpensive conciliatory framework utilizing administrative expertise to resolve differences of the type before us. On the other hand, we must recognize that a private person had the right to sue under § 1981 for racial discrimination in employment prior to the enactment of Title VII, see Jones v. Alfred H. Mayer Co., 392 U.S.

409, 427, 442 n. 78, 88 S.Ct. 2186, 20 L. Ed.2d 1189 (1968); Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979 (1973); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970), cert. denied, 401 U.S. 948, 91 S.Ct. 935, 28 L.Ed.2d 231 (1971), and that nothing in the language of Title VII purports expressly to require recourse to the Commission before such a suit may be brought. Furthermore, starting with the premise that repeals by implication are not favored, United States v. Borden, 308 U.S. 188, 60 S.Ct. 182, 84 L.Ed. 181 (1949), Title VII does not meet the conditions precedent to such a repeal, see Posadas v. National City Bank, 296 U.S. 497, 56 S.Ct. 349, 80 L.Ed. 351 (1936). Title VII is not in irreconcilable conflict with § 1981, and it does not cover the entire subject matter of that section. If anything, the legislative history of Title VII indicates that it was intended to buttress and supplement § 1981 in a specific area rather than to serve as a substitute for § 1981 itself. See 110 Cong.Rec. 13650–52 (1964); Sullivan v. Little Hunting Park, 396 U.S. 229, 90 S.Ct. 400, 24 L. Ed.2d 386 (1969). For these reasons we are satisfied that Title VII has neither preempted § 1981 nor precluded an independent lawsuit based on a violation of that statute. Macklin v. Spector Freight Systems, Inc., 156 U.S.App.D.C. 69, 478 F.2d 979 (1973); Brady v. Bristol-Meyers, Inc., 459 F.2d 621 (8th Cir. 1972); Sanders v. Dobbs Houses, Inc., 431 F.2d 1097 (5th Cir. 1970); Caldwell v. National Brewing Co., 443 F.2d 1044 (5th Cir. 1971), cert. denied, 405 U.S. 916, 92 S.Ct. 931, 30 L.Ed.2d 785 (1972); Young v. International Telephone and Telegraph Co., 438 F.2d 757 (3d Cir. 1971).

■ Turning to the merits, we are guided by the basic principle that the district court's denial of preliminary relief may be reversed only if found to be a clear abuse of discretion. "The settled rule is that a preliminary injunction should issue only upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." Sonesta Int'l Hotels Corp. v. Wellington Associates, 483 F.2d 247, 250 (2d Cir. 1973). See Gulf & Western Industries, Inc. v. The Great Atlantic and Pacific Tea Company, Inc., 476 F.2d 687 (2d Cir. 1973); Checker Motors Corp. v. Chrysler Corp., 405 F.2d 319 (2d Cir.), cert. denied, 394 U.S. 999, 89 S.Ct. 1595, 22 L.Ed.2d 777 (1969); Dino De-Laurentiis Cinematografica, S.p.A. v. D–150, Inc., 366 F.2d 373 (2d Cir. 1966).

■ It is readily apparent that appellant has not satisfied any of these requirements for granting the extraordinary relief of a preliminary injunction. Only upon a showing of unlawful discrimination will formal open recruiting or some other recruiting method be mandated in lieu of word-of-mouth recruiting. Where a pattern of past discrimination appears, recruitment procedures that might otherwise be classified as neutral will no longer be accepted as non-discriminatory. Additional methods must then be devised to compensate for the effects of past discriminatory practices and to guard against their perpetuation or recurrence. Rios v. Enterprise Association Steamfitters Local 638, et al., 501 F.2d 622, 629 et seq. (2d Cir. 1974); United States v. Georgia Power Company, 474 F.2d 906 (5th Cir. 1973); Brown v. Gaston County Dyeing Machine Company, 457 F.2d 1377 (4th Cir.), cert. denied, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972); Rowe v. General Motors Corporation, 457 F.2d 348 (5th Cir. 1970); Sparham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970). However, absent such a showing, word-of-mouth recruiting will not be barred.

In the present case appellant has failed to prove that a pattern of discrimination against blacks existed at the College. On the contrary the evidence es-

tablished, and Judge Dooling found, an absence of any such discrimination, purposeful or otherwise. About 5% of Nassau County's population is black and of the 18,000 day and evening students attending the College approximately 650 or 3.6% are black. Of approximately 450 teaching faculty members at the College, 44, or 9.8%, are black, of whom 20 are tenured, with 3 out of the 26 department heads being black. Lastly, 1 of the 9 members of the President's own staff is black. Thus the black percentage of staff and faculty members far exceeds the black percentage of the community's population and study body. On this record we cannot disagree with Judge Dooling's observation that "these figures together . . . do not spell out statistical discrimination."

Nor was the claim of discrimination established through other proof. On the contrary, here again the evidence supports Judge Dooling's finding that the differences between Dr. Chambers and some members of the College's faculty amounted to a "family quarrel" rather than a dispute over racial discrimination. Unlike some of its counterparts the College has successfully established an Afro-American studies program. Although there was "friction" in the formulation of that program, some of it involving appellant, Judge Dooling found that it was not "discriminatory friction." He further found that there was no substance to allegations of racial discrimination in faculty appointments, concluding:

> " . . . the whole case dealing with Miss Kronovich's [sic] appointment is not oriented to the problem of discrimination, it seems to me, but is oriented to the older and deeper dispute between faculty and administration over their respective roles."

On this record these findings can hardly be labelled clearly erroneous.

Absent proof of discrimination the informal word-of-mouth method used by Dr. Chambers in the selection of Dr. Kronovet as Associate Dean cannot be condemned as violative of plaintiff's civil rights.[4] Furthermore, in addition to her failure to show probability of success on the merits, appellant has failed to show that she would suffer irreparable harm as a result of denial of preliminary injunctive relief. She has not shown that Dr. Kronovet is unqualified for the position to which she was appointed or that, should Dr. Kronovet be enjoined from holding that position, appellant or some better qualified person would be selected as Associate Dean.

Thus a grant of preliminary injunctive relief would only deprive the College of a qualified officer pending final disposition of the suit. Should appellant ultimately succeed on the merits, denial of a preliminary injunction would not bar the court from granting appropriate final relief.

The order of the district court is affirmed.

---

4. Judge Dooling did not rule on the validity of Dr. Kronovet's appointment insofar as it related to the teachers' union contract. Nor did he formally rule on the question of whether the Affirmative Action Officer should be a full-time or part-time position, although by implication he indicated that Dr. Kronovet would be expected, as Associate Dean, to perform the duties of Affirmative Action Officer and other duties.