**AMERICAN TRAIN DISPATCHERS ASSOCIATION, Appellee,**

v.

**BURLINGTON NORTHERN, INC., Appellant.**

No. 76–1509.

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 13, 1977.

Decided March 9, 1977.

As Amended on Denial of Rehearing April 8, 1977.

750

Barry McGrath, St. Paul, Minn., for appellant.

Gordon P. MacDougall, Washington, D.C., for appellee.

Before LAY and ROSS, Circuit Judges, and WANGELIN, District Judge.*

ROSS, Circuit Judge.

This suit was brought by American Train Dispatchers Association (ATDA),[1] on behalf of nine train dispatchers, seeking a preliminary injunction to prevent Burlington Northern, Incorporated (BN)[2] from consolidating its dispatching office at Grand Forks, North Dakota with its dispatching office at Minneapolis, Minnesota. ATDA's primary complaint is that persons becoming dispatchers after March 3, 1970, the date of the BN merger, are entitled to certain merger protective conditions imposed by the I.C.C. in approving the merger. BN disputes this proposition, contending that the merger protective agreement approved by the I.C.C. applies only to dispatchers employed by BN at the time of the merger. The postmerger dispatchers and BN are currently litigating this issue in the I.C.C.[3]

---

* The Honorable H. Kenneth Wangelin, United States District Judge for the Eastern District of Missouri, sitting by designation.

1. ATDA is the collective bargaining representative for train dispatchers employed by Burlington Northern, including those dispatchers whose interests are at stake in this litigation.

2. BN is a railroad corporation situated and doing business within the jurisdiction of this court.

3. The case was submitted to the I.C.C. on July 6, 1976. See note 6, infra.

After a hearing on ATDA's motion for equitable relief, the district court preliminarily enjoined the consolidation pending a decision of the I.C.C., holding: 1) ATDA's claim " * * * is not frivolous[,]" and 2) the train dispatchers would suffer irreparable injury if the consolidation was effected at this time. For the reasons described below, we reverse and order the preliminary injunction dissolved.

## I.

In *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1326 (8th Cir. 1973), we said:

> In order to justify the issuance of a preliminary injunction by the trial court, the movant has the burden of showing:
>
> (1) substantial probability of success at trial by the moving party, and
>
> (2) irreparable injury to the moving party absent such issuance.

*See also Chicago Stadium Corp. v. Scallen*, 530 F.2d 204, 206–207 (8th Cir. 1976); *American Home Investment Co. v. Bedel*, 525 F.2d 1022, 1023 (8th Cir. 1975); *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation*, 507 F.2d 1281, 1287 (8th Cir. 1974). The district court has considerable discretion in weighing the equities, and an order granting a preliminary injunction will be overturned only when the court has abused its discretion. *See Chicago Stadium Corp. v. Scallen*, supra, 530 F.2d at 206; cf. *American Home Investment Co. v. Bedel*, supra, 525 F.2d at 1023; *Wounded Knee Legal Defense/Offense Committee v. Federal Bureau of Investigation*, supra, 507 F.2d at 1288.

We hold that the district court abused its discretion in preliminarily enjoining BN's proposed consolidation; specifically, we find clearly erroneous the determination that the dispatchers will be irreparably injured absent injunctive relief.

## II.

BN is the surviving railroad of the merger of the former Great Northern Railway Company, Northern Pacific Railway Company and other railroads. The merger was approved by the I.C.C. in *Great N. P. & Burlington Lines, Inc. Merger,* 331 I.C.C. 228 (1967), *aff'd sub nom. United States v. United States,* 296 F.Supp. 853 (D.D.C. 1968), and sustained by the Supreme Court in *Northern Lines Merger Cases,* 396 U.S. 491, 90 S.Ct. 708, 24 L.Ed.2d 700 (1970). The merger became effective on March 3, 1970.

BN's proposed consolidation of the Grand Forks and Minneapolis dispatching offices affects some 37 train dispatchers in total. Ten or eleven train dispatchers will be required to change their place of employment, principally from Grand Forks to Minneapolis. However only nine of the 37 are postmerger dispatchers affected by the present litigation. BN's proposed consolidation will require the transfer of only three or four of these postmerger dispatchers from Grand Forks to Minneapolis; the five or six other affected postmerger dispatchers are presently located in Minneapolis. No dispatcher presently before the court will be terminated from BN's employment as a result of the consolidation.

It is undisputed that BN has the power to effect the proposed consolidation of the Grand Forks and Minneapolis dispatching offices.[3a] The I.C.C. itself has recognized as much in approving the merger, stating that "[t]he [merger] agreement recognizes the right of [BN] to transfer work throughout the merged system * * *." 331 I.C.C. at 278. The 1966 ATDA–BN mediation agreement also recognizes " * * * the right of the carrier to introduce technological, organizational and operational changes * * *," including the consolidation of train dispatching offices. Thus even assuming *arguendo* that the postmerger dispatchers are entitled to protection under

---

**3a.** BN's power to effect the consolidation is of course subject to the employee protective conditions agreed upon and imposed by the I.C.C.

under the terms of the BN–ATDA merger agreement.

the merger agreement, such protection is limited to compensatory benefits and does not include the power to prevent the consolidation of the Grand Forks and Minneapolis dispatching offices.

The merger protective agreement governs the hours of service and working conditions of train dispatchers. The agreement imposes conditions for the protection of dispatchers who might be adversely affected by merger-related transactions.[4] Section 2 of the merger agreement guarantees the compensation of an affected dispatcher in the event of a merger-related transaction until the dispatcher's job is terminated through natural attrition. The guaranteed compensation for a dispatcher holding a regularly assigned position is the established rate of the position he holds on the work day immediately preceding the date of the transaction. A dispatcher who does not hold a regularly assigned position receives a wage guarantee based on the established rate of the last position regularly assigned to him or, if the dispatcher has never held a regular position, he receives a rate of compensation determined by the total compensation for all services performed by him (excluding compensation paid where no services were performed such as vacation, paid holidays, etc.) for the last twelve months, divided by the number of days such service was performed. In addition to wage guarantees, under the merger agreement a transferred dispatcher receives certain property settlement protections, a transfer allowance of $500 and reimbursement for wage loss due to transfer not to exceed six working days.

ATDA and BN are parties to a national mediation agreement dated June 16, 1966, which provides protection to dispatchers who are adversely affected by proposed action of the railroad, including consolidation of dispatching facilities not subject to approval by the I.C.C. The 1966 agreement provides wage guarantees to affected dispatchers for a period not exceeding five years. The displacement allowance is approximately equal to that provided under the merger agreement. A displaced employee is entitled to a monthly displacement allowance determined by: 1) the total compensation received by the dispatcher during the last twelve months preceding the proposed action, divided by twelve; and 2) the total time for which the dispatcher was paid during the twelve month test period, divided by twelve. This calculation produces an average monthly compensation rate and an average monthly work period which, taken together, represent the monthly displacement allowance. In addition, the 1966 agreement affords moving expenses to dispatchers required to change places of employment as a result of the consolidation of facilities. Section 10 of the agreement provides:

> [An affected dispatcher] shall be reimbursed for all expenses of moving his household and other personal effects and for the traveling expenses of himself and his family and his own actual wage loss during the time necessary for such transfer, and for a reasonable time thereafter (not to exceed two working days), used in securing a place of residence in his new location.

Furthermore, an affected dispatcher is entitled to reimbursement by BN for any loss suffered from the sale of his home for less than its fair value.

It is not disputed that BN is suffering considerable financial losses daily as a result of the preliminary injunction. The railroad has purchased new equipment which, because of the injunction, is going unused. BN has suffered expenses in connection with training Grand Forks employees for their new positions in Minneapolis. The railroad also stands to save approximately $240 per day with respect to wage savings relating to employees not involved in this litigation. The preliminary injunction has precluded the railroad from realizing these savings. BN estimates that it is losing approximately $300 per day as a result of the preliminary injunction.

---

4. 49 U.S.C. § 5(2)(f) requires " * * * a fair and equitable arrangement to protect the interests of the railroad employees affected[,]" as a condition to I.C.C. approval of a merger.

### III.

The district court found that the train dispatchers would suffer irreparable injury if the consolidation was effected for the following reasons:

The disruption to a person and his family caused by moving to new locations is damage which cannot be fully compensated by an award of monetary damages. * * * The 9 post-merger train dispatchers will not have their train dispatcher earnings guaranteed in their new positions, and it is anticipated that 7 of these men, who will be considered extra train dispatchers, will have lesser amounts of extra work because the consolidation of offices is projected to result in lesser amounts of extra work, and with a resultant lower standard of living.

We cannot agree with this finding.

The disruption of transfer which will be caused to the transferred dispatchers and their families, while undoubtedly regrettable, is inevitable. Every authoritative source—the merger protective agreement, the national mediation agreement and the I.C.C.—recognizes that BN may, within its sole discretion, effect the consolidation at issue. See n. 3a, *supra.*

Furthermore, the nine postmerger train dispatchers will have their earnings guaranteed while their entitlement to merger protective benefits is litigated. Under the 1966 national mediation agreement, with which BN has assured this court it will comply pending decision on the merits of this dispute, the dispatchers will be entitled to approximately the same guaranteed compensation as is available under the merger protective agreement itself. See Part II, *supra.* The 1966 agreement provides that "* * * a displaced employee shall be paid a monthly displacement allowance equal to the difference between the monthly compensation received by him in the position in which he is retained and the average monthly compensation received by him [during the last twelve months preceding his displacement]." Assuming the postmerger dispatchers prevail on the merits of their claim that they are entitled to merger protective benefits, any difference in benefits can be retroactively awarded.[5]

It is true, as ATDA argues, that the wage guarantee protective period under the merger agreement is significantly broader than the protective period provided in the 1966 mediation agreement. The merger agreement provides protection for the duration of a particular train dispatcher's employment whereas the 1966 agreement provides that the protective period may not exceed five years. This distinction is meaningless in the present posture of this litigation however. The dispatchers' entitlement to either protective period will be litigated long before the distinction would become meaningful.

Minor differences exist between the two agreements with respect to moving expenses and protection from loss on the sale of real property. However, these differences in monetary terms are de minimis (see Part II, *supra*) in relation to the losses—estimated to be $300 daily—which BN

---

5. ATDA argues that the 1966 agreement does not apply to the dispatchers involved in this litigation. ATDA points out that the agreement shall not apply to any transaction subject to I.C.C. approval. The Association reasons that because the proposed consolidation is merger-related, it is subject to I.C.C. approval, and the dispatchers will thus be unprotected pending litigation on the merits.

We reject this argument. First, BN has agreed to comply with the terms of the 1966 agreement pending litigation on the merits. Any adjustment in the difference between the benefits allowable under the merger protective agreement and those allowable under the 1966 agreement can be the subject of a retroactive award. Thus, in any event, the dispatchers are covered during the period in which their claim is litigated on the merits. Second, we entertain grave doubts that, assuming the postmerger dispatchers are not entitled to benefits under the merger protective agreement, the dispatchers are also not entitled to protection under the 1966 agreement. We have been pointed to no authority which requires I.C.C. approval of this specific consolidation. Indeed every source indicates that BN can consummate the consolidation within its sole discretion. It suffices to hold that ATDA has not established with requisite clarity its probable success on the merits of the applicability of the 1966 agreement in order to justify preliminary injunctive relief.

is suffering as a result of the preliminary injunction. It is important to note that if the postmerger dispatchers prevail on the merits of their claim, the merger protective benefits can be awarded retroactively, while the losses which BN has suffered are irretrievable.

■ Our decision is buttressed by the construction which has been given to § 5(2)(f) of the Interstate Commerce Act. Section 5(2)(f) provides in relevant part as follows:

> As a condition of its approval, under this paragraph, of any transaction involving a carrier or carriers by railroad subject to the provisions of this chapter, the Commission *shall require a fair and equitable arrangement to protect the interests of the railroad employees affected.* In its order of approval the Commission shall include terms and conditions providing that during the period of four years from the effective date of such order such transaction will not result in employees of the carrier or carriers by railroad affected by such order being in a worse position with respect to their employment, except that the protection afforded to any employee pursuant to this ·sentence shall not be required to continue for a longer period, following the effective date of such order, than the period during which such employee was in the employ of such carrier or carriers prior to the effective date of such order. (Emphasis added.)

In *Brotherhood of Maintenance of Way Employes (BMWE) v. United States,* 366 U.S. 169, 81 S.Ct. 913, 6 L.Ed.2d 206 (1961), the Supreme Court held that § 5(2)(f) does not require the surviving railroad to retain all employees in its employ, for a period of time equal to the previous employment with the company, not to exceed four years. The Court held that § 5(2)(f) requires only

that discharged employees receive adequate compensatory benefits. In reviewing the legislative and administrative history of the statute, the Court specifically said that § 5(2)(f) was not intended to saddle railroads with the onerous burden of a "job freeze" for the benefit of railroad employees affected by mergers. *Id.* at 175–176, 81 S.Ct. 913. *See also Norfolk & Western Railroad Co. v. Nemitz,* 404 U.S. 37, 42, 92 S.Ct. 185, 30 L.Ed.2d 198 (1971); *Laturner v. Burlington Northern, Inc.,* 501 F.2d 593, 603–609 (9th Cir. 1974), *cert. denied,* 419 U.S. 1109, 95 S.Ct. 783, 42 L.Ed.2d 806 (1975); *Wagner v. Burlington Northern, Inc.,* 411 F.Supp. 537, 541–542 (N.D.Ill. 1976).

To be sure, the *BMWE* case is not precisely in point. However, it is persuasive in this case, especially in view of the absence of irreparable harm on this record. The unmistakable effect of the preliminary injunction is to prevent—albeit temporarily— the railroad from abolishing its dispatching positions in Grand Forks and creating additional dispatching positions in Minneapolis. *BMWE* teaches that § 5(2)(f) was not intended to block such an operational change which the railroad has the power to effect in any event, but only to guarantee that affected employees will not be put in a worse position with respect to compensation. *Cf. Laturner v. Burlington Northern, Inc., supra,* 501 F.2d at 603–609; *Wagner v. Burlington Northern, Inc., supra,* 411 F.Supp. at 541–542.

### IV.

■ In view of the current posture of this litigation, we find it necessary to state what we do not decide. First, we express no opinion as to the probable merits of the postmerger dispatchers' claim to benefits under the merger protective agreement.[6]

---

**6.** On March 2, 1977, after this opinion had been prepared, the I.C.C. issued its order adopting the view that the only employees affected by the merger agreement are those who were already employed when the agreement was executed. On March 3, 1977, ATDA filed a motion to dismiss this appeal which has been resisted

by BN on the grounds that the March 2 order is not final and for other reasons.

We decline to dismiss the appeal as moot. The order, by its own terms, does not become effective until April 1, 1977. ATDA has acknowledged that it intends to pursue its right to ask for reconsideration by the I.C.C. but

Second, we do not pass on BN's claim that the question raised by the postmerger dispatchers is subject to mandatory arbitration or whether, as ATDA claims, the dispute involves an interpretation of § 5(2)(f) which the Commission and the courts have power to review. Finally, in view of our disposition dissolving the preliminary injunction, we find it unnecessary to decide whether the district court erred in not requiring ATDA to post bond under Fed.R.Civ.P. 65(c) as a condition of issuing the preliminary injunction. We hold only that the preliminary injunction was improvidently granted in this case where: 1) the Grand Forks-Minneapolis consolidation is indisputably within the power of the railroad under the terms of the I.C.C. approved merger agreement and 2) the allegedly affected employees will not be irreparably harmed while pursuing adequate legal remedies for any compensatory benefits to which they might be entitled.

The mandate of this court shall issue forthwith. All costs shall be assessed against ATDA.

Reversed.

LAY, Circuit Judge, concurring.

I concur in Judge Ross' opinion. However, I think it is time that this court reconsider the traditional test for the issuance of a preliminary injunction as set forth in *Minnesota Bearing Co. v. White Motor Corp.*, 470 F.2d 1323, 1326 (8th Cir. 1973). The traditional test for the issuance of a preliminary injunction has been the showing of both irreparable harm as well as requiring that the movant assume the burden of showing probability of success at trial. The Second Circuit and the Ninth Circuit have indicated that there is an alternative basis for granting a preliminary injunction which is more realistic and, in my judgment, should be considered by the federal district court. This test was recently approved in *Aguirre v. Chula Vista Sanitary Service and Sani-Tainer, Inc.*, 542 F.2d 779, 781 (9th Cir. 1976), in which the court said:

> In *Gresham v. Chambers*, 501 F.2d 687, 691 (2d Cir. 1974), the Second Circuit held that a preliminary injunction should issue " . . . upon a clear showing of either (1) probable success on the merits *and* possible irreparable injury, *or* (2) sufficiently serious questions going to the merits to make them a fair ground for litigation *and* a balance of hardships tipping decidedly toward the party requesting the preliminary relief." This circuit has adopted the *Gresham* test. *See William Inglis & Sons Baking Co. v. ITT Continental Baking Co.*, 526 F.2d 86, 88 (9th Cir. 1975). On remand, the district court should balance the relative hardship to the parties that would result from granting or denying a preliminary injunction. If the balance tips decidedly toward plaintiffs, and if plaintiffs have raised questions serious enough to require litigation, the injunction should issue.

In applying this alternative test and balancing the factual analysis set forth by Judge Ross, I would find nonetheless that the district court abused its discretion in granting the preliminary injunction.

---

claims it would not seek any extension of the injunction beyond March 7, 1977. However, if we should dismiss this appeal as moot, the determination of the proper date of expiration of the injunction would be left to the determination of the trial court, not ATDA. As we read the order, its effective date is April 1, 1977, the expiration date of the injunction is April 6, 1977, and in the opinion of this court, the case is not moot.