**Ronald G. BRAZER, Plaintiff,**

v.

**ST. REGIS PAPER COMPANY, a corporation, The International Brotherhood of Pulp, Sulphite and Paper Mill Workers, AFL–CIO, and its Local 749, United Papermakers and Paperworkers, AFL–CIO, and its Local 636, Defendants.**

**Civ. A. No. 77–746–Civ–J–B.**

United States District Court,
M. D. Florida,
Jacksonville Division.

Aug. 22, 1980.

W. Benjamin Kyle, Jacksonville, Fla., for plaintiff.

Guy Farmer, Judith S. Waldman, and Gary L. Lieber, Washington, D. C., William L. Durden, Jacksonville, Fla., for St. Regis.

Benjamin Wyle and Linda G. Bartlett, New York City, for Union.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HIGBY, District Judge.

The Plaintiff, Ronald Brazer (Brazer), is a black man and a former employee of Defendant, St. Regis Paper Company (St. Regis), and a former member of Defendants, The International Brotherhood of Pulp, Sulphite, and Paper Mill Workers, AFL–CIO and its Local 749, and United Papermakers and Paperworkers and its Local No. 636 (referred to collectively as Union). Brazer sues St. Regis under Title VII of the Civil Rights Act of 1964[1] alleging employment discrimination. He sues the Union and St. Regis under the Civil Rights Act of 1870[2] for denial of his civil rights. And Brazer sues the Union for failing because of discriminatory reasons to fairly represent him. The court has jurisdiction. 28 U.S.C. §§ 1331, 1343; 29 U.S.C. § 185(c). Brazer's claims against St. Regis are based upon discipline he received, a demotion, and his discharge. His claims against the Union are based upon the representation it provided him in his disputes with St. Regis.

## FINDINGS OF FACT

Brazer's initial experiences at St. Regis were pleasant. He was hired March 1, 1968, as a Chip Silo and Conveyer Operator in the woodyard. The woodyard provides fuel to power sources in the plant. Bark and other wood leavings from the mill are trucked into the yard, unloaded, and transported on various conveyers down chutes into machines which prepare them for burning. Eventually the wood finds its way

---

**1.** 42 U.S.C. § 2000e, *et seq.*

**2.** 42 U.S.C. § 1981.

into furnaces where it is burned to produce power. Brazer's two most significant positions in the woodyard were Payloader-Bulldozer Operator and Tour Foreman. The Payloader-Bulldozer Operator unloads wood and moves it to the proper locations and conveyers for processing. The Tour Foreman is a supervisor, second in command in the woodyard, the on-the-site person responsible for overseeing the woodyard crew and dealing with problems which arise. The woodyard ran twenty-four hours a day, the employees working in four rotating eight-hour shifts. Until 1977 one Payloader-Bulldozer Operator, known as the special or day operator, did not rotate shifts but worked the early day shift regularly. When he was Payloader-Bulldozer Operator, Brazer held the special position until it was abolished.

Less than two years after he was hired Brazer was promoted to Payloader and Bulldozer Operator. In November, 1975, Brazer was again promoted out of the ordinary progression to the newly created position Tour Foreman. Afterwards the allegedly discriminatory acts occurred.[3] St. Regis hired three other Tour Foreman when they hired Brazer. Two were white and one was black. A training program was available at that time for Tour Foreman. Because of the need for the Tour Foreman in the woodyard, St. Regis only sent two of the four new Tour Foreman to the program. One was black. One was white. Neither was Brazer.

One month after he began as Tour Foreman, on December 22, 1975, Brazer had a dispute with George Donoroma, an operator under his supervision. Donoroma was sitting when he should have been working. Brazer chastised him and ordered him to get busy. Upset over the reprimand, Donoroma called Brazer's supervisor, Zeke Bradley, and claimed Brazer had been abusive and unreasonable. Bradley contacted a Union representative, and the pair went to the yard to speak to Donoroma and Brazer.

After listening to everybody's version of the events, Bradley declared Brazer had acted properly. He changed Donoroma's shift for the remainder of the week. Later he changed the shift Brazer supervised from Donoroma's to another. He had several reasons. Donoroma was emphatic in his claims that Brazer abused and harassed him. He intended to quit or transfer to a lower position to avoid Brazer. As a supervisor, Brazer was not a Union member. Donoroma was a Union member and protected by a contract which gave him a vested interest in his position, including the shift he was on. Transferring Donoroma would have triggered an annoying, time-consuming grievance proceeding. Donoroma had been a member of that shift for some time and worked well with its members. Brazer, on the other hand, had worked with the group less than a month. Consequently, he had not yet developed a closeness and camaraderie with the shift members which would be lost when he was transferred. The change in shifts, as a practical matter, did Brazer no harm. In fact, Brazer did not care which shift he supervised. The shifts rotated among the four daily work periods so Brazer, regardless of his shift, would work each period in turn.

The second incident Brazer claims shows discrimination occurred Saturday, December 20, 1975. While Brazer was on duty a flume chain broke. He called a company maintenance man, Sadler, who told Brazer he was off and the repair could wait. As procedures required when a mechanic was asked to treat a repair as an emergency when he did not think it was, the maintenance man told Brazer he would contact Bradley and get back in touch. Bradley required Sadler to make the repair. Brazer testified vaguely and unconvincingly about the times he felt maintenance was uncooperative because of his race.

---

**3.** Brazer testified to one pre-promotion incident where he claims he was deliberately misinformed about tools needed to take a mechanic's test. I do not accept his testimony. He certainly has no basis for believing the misinformation was deliberate or on account of his race. Furthermore, by his own testimony, he could have taken the test later, but he did not.

February 7, 1976, Cecil Morris, the Tour Foreman of the shift before Brazer's, called an outside mechanic to make a repair. The Union contract required St. Regis to also call the Union mechanic on call to attend the repair. Although the breakdown occurred during Morris' shift, the work was done during Brazer's. The Union mechanic filed a grievance. He prevailed and the company paid the mechanic the money he would have received. The memo directing payment to the Union mechanic has written on it in red ink: "Per woodyard records, Ron Brazer was Tour Foreman on this shift." Brazer claims he was pressured to sign some paper acknowledging responsibility for the error. He has not, however, placed the paper in the record, and the court does not accept his testimony. The memo accurately shows Brazer was on duty when the repair was made. Brazer suffered no harm from the incident.

Brazer stepped down from his Tour Foreman position in September, 1976. He chose to make the change. In addition to incidents already discussed, Brazer had many difficulties. He often clashed with his subordinates. Although he meant well, his temper was quick and he lacked tact. He was also relatively inexperienced. The factors combined to make Brazer a less than effective supervisor. He neither gave nor received orders well. Brazer was aware of this and several times discussed his problems with Bradley and Joe Donald, the Plant Superintendent. Those men sincerely believed Brazer had been promoted too quickly. They suggested he return to his previous position as a Payloader-Bulldozer Operator where he would once again be a member of the Union bargaining agent and protected by the contract. Brazer had been considering the same move. He accepted the suggestion and requested transfer to his former position. St. Regis granted the request; September, 1976, Brazer was transferred to the Payloader-Bulldozer Operator position. The person who filled Brazer's Tour Foreman position was a black male.

In October, 1976, Brazer filed a charge of employment discrimination with the Equal Opportunity Employment Commission spec-

ifying his not being sent to training school, the mechanic incident, the Donoroma incident, and his return to the Payloader-Bulldozer Operator position as instances of discrimination. The EEOC turned Brazer's complaint over to the Jacksonville Community Relations Commission for investigation. Although Brazer did not cooperate, the JCRC investigated his complaint. The JCRC eventually found no discrimination, and the EEOC, upon Brazer's request, issued a right to sue letter.

When St. Regis transferred Brazer, it accidentally placed him in a rotating shift instead of the special day shift he once had. As soon as Brazer pointed out the error, it was corrected.

November 17, 1976, Brazer's Tour Foreman, J. E. Keeler, noticed Brazer fueling his payloader at a pump other than the pump designated for that purpose. He asked why. In a rude tone Brazer replied that he would run out of fuel before he reached the proper pump and he knew what he was doing.

For the next three months things rocked along without Brazer causing much more trouble. On February 14, 1977, he and J. E. Keeler once again differed. That day the conveyer which usually carried wood chips into the plant was broken. Consequently, chips had to be fed into the chute with a small payloader. At the same time the usual procedure of unloading wood chips from incoming trucks with the large payloader had to be continued. The two payloaders were about 100 yards apart. Keeler told Brazer to load chips with the small payloader any time he had all the incoming trucks empty. Brazer refused to follow the orders saying he was not going to do two jobs at once. Keeler told him to follow instructions or hit the clock. Brazer hit the clock. He was suspended for four days. Brazer complained about this incident to his shop steward, Kelly. Kelly told Brazer a grievance could be filed but success was highly unlikely because Brazer had refused a direct order to do a non-dangerous task. Brazer's behavior violated the time-honored

Union code—"Work Now, Grieve Later." Brazer followed Kelly's advice. Union officials, including Kelly, Union President Cater Scarborough, and Vandolan Johnson, defended Brazer and met with St. Regis officials on his behalf. Due in part to their efforts, St. Regis limited Brazer's punishment to suspension, although his offense was a dischargeable one.

Brazer learned overtime work was available March 7, 1977. When he requested it, Keeler told him he was not eligible because he was a day operator. A 1967 agreement which involved two individuals but had been uniformly interpreted by St. Regis and the Union to apply to all Payloader-Bulldozer Operators prohibited the day operator from working overtime unless all the other operators had turned it down. All the other operators who could have received the overtime were black.

Brazer asked Kelly to file a grievance on his behalf. Kelly believed the 1967 agreement governed the dispute. Following Union procedure, Brazer took his request for a grievance to the Union membership, which voted to prosecute his grievance. Union Vice-President Johnson then took up Brazer's cause, prosecuting the grievance vigorously but unsuccessfully. Later St. Regis added more operators and abolished the day operator position. Brazer then began working shifts and received opportunities for his proportionate share of overtime.

One pay day in March, 1977, Brazer found a note at the time clock instead of his paycheck. The noted asked him to see his supervisor, Joe Hall. With his shop steward Brazer went to see Hall, who wanted to correct a mix-up about payroll deductions for a savings bond. Hall gave Brazer his check immediately, and the problem was straightened out.

April of 1977 Brazer began having an absenteeism problem. He called in sick April 23 and 24, two days before his vacation began, and May 5 and 7, the two days following his vacation. May 11, 1977, Brazer's new supervisor, C. J. Johnson, a black man, met with Brazer and Union Vice-President Johnson to warn Brazer that further similar absences would cause disciplinary action. May 23, 1977, Brazer missed work again. He refused to give C. J. Johnson any explanation other than stating he had car trouble. C. J. Johnson decided to issue a written warning. May 25, 1977, C. J. Johnson met with Vandolan Johnson and Brazer to give Brazer his absenteeism warning. Brazer refused to accept the written warning. "C. J.," he said, "you can take that and wipe your ass with it. I haven't said anything to this point, but I'll tell you now. I have worked with you as a foreman and as an employee. You do just what the crackers tell you to do to drive me out of the mill. If you give me this, you are no more than a no good son-of-a-bitch." He repeated essentially the same litany later that day. C. J. Johnson sent Brazer home. St. Regis officials met with Brazer, Vandolan Johnson, and Scarborough about the incident. C. J. Johnson recited what happened and Brazer and Vandolan Johnson confirmed it. Brazer's and the Union's defense was that the comments were understandable over-reaction to perceived harassment. After considering the matter, St. Regis disagreed and on June 6, 1977, discharged Brazer for using profane and abusive language to a supervisor.

Brazer spoke with Union officials about filing a grievance. They were sympathetic and willing to represent him. But Brazer never pursued filing the grievance.

## CONCLUSIONS OF LAW

*The Union*

■ At the close of the Plaintiff's case, I directed a verdict for the Union. Under his 1981 theory, Brazer had to prove the Union intentionally discriminated against him because of his race. *Williams v. DeKalb County*, 577 F.2d 248 (5th Cir. 1978), *on reh.*, 582 F.2d 2 (5th Cir. 1978). Under his Title 29, United States Code, Section 185 theory, Brazer had to prove the Union failed to represent him without discrimination, fairly, impartially, and in good faith. *Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 96 S.Ct. 1048, 47 L.Ed.2d 231 (1976); *Bond v. Local Union 823, Int'l Brotherhood of*

Teamsters, Chauffeurs, Warehousemen and Helpers of America, 521 F.2d 5 (8th Cir. 1975). His evidence showed the Union faithfully and vigorously supported him. The Union prosecuted each grievance he brought to it, including his discharge. Brazer's discharge grievance died because Brazer abandoned it, not because the Union failed to support him.

If possible, there is even less evidence of discrimination by the Union than there is of failure to represent impartially and in good faith. Brazer himself testified he did not think the Union discriminated against him on account of his race. Brazer totally failed to prove either of his claims against the Union.

*St. Regis*

 Brazer claims every action described in the Findings of Fact other than his promotions were discriminations by St. Regis against him because of his race. Some of his claims against St. Regis under his Title VII theory are barred because they were not the subject of EEOC charges. A complaint to the EEOC is a prerequisite to a Title VII claim. *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455 (5th Cir. 1970). Brazer filed his EEOC charge in October, 1976. In it he complained of his demotion from Tour Foreman, not being sent to the training program, denial of mechanical assistance while Tour Foreman, and being required to sign for Cecil Morris' error. "When an employee seeks judicial relief for incidents not listed in his original charge to the EEOC, the judicial complaint nevertheless may encompass any discrimination like or reasonably related to the allegations of the EEOC charge, including new acts occurring during the pendency of the charge before the EEOC." *Oubichon v. North American Rockwell Corporation*, 482 F.2d 569, 571 (9th Cir. 1973). Whether the subsequent acts are "like or reasonably related to the allegations of the EEOC charge" is a factual matter. *Id.* The acts occurring after Brazer returned to the Payloader-Bulldozer Operator position were not like or reasonably related to the acts he listed in his EEOC charge. Different jobs and a substantially changed cast of characters were involved. Also, there is no evidence

the investigation of Brazer's charge expanded to include the latter events, thus perhaps justifying allowing suit on those events. *See, Hubbard v. Rubbermaid, Inc.*, 436 F.Supp. 1184 (D.Md.1977).

 Nonetheless, all the incidents and Brazer's two theories of recovery will be discussed together since the disputes are primarily factual and as the facts are found Brazer's theories are irrelevant. He loses under either. Title VII broadly prohibits employers discriminating against any individual "with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex or national origin . . ." 42 U.S.C. § 2000e–2(a)(1). Title 42, United States Code, Section 1981 states: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens . . . ." Under it a plaintiff may recover for discrimination against him in employment on account of race. *Goss v. Revlon, Inc.*, 548 F.2d 405 (2d Cir. 1976); *Gresham v. Chambers*, 501 F.2d 687 (2d Cir. 1974). And bringing a Title VII action does not preclude a 1981 action based on the same facts. *Id.* In a 1981 action a plaintiff must show purposeful discrimination before a defendant must rebut the charge. *Williams v. DeKalb County*, 577 F.2d 248 (5th Cir. 1977), *on reh.*, 582 F.2d 2 (5th Cir. 1978). In a Title VII action discrimination may be inferred from disparate treatment unless the defendant proves a legitimate nondiscriminatory reason for the disparate treatment. *McDonnell Douglas v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Brazer's claim under either theory can be discussed together because the evidence did not show disparate treatment let alone intentional discrimination. The evidence shows Brazer complains of imagined wrongs and well justified discipline.

Brazer alleges several different discriminations by St. Regis. He claims a different disciplinary standard was applied to him because he was black, he was discriminated

against in promotion because of his race, he was denied training because of his color, and St. Regis retaliated against him for filing his complaint with the EEOC. Those claims, if proved, would entitle Brazer to relief. He did not prove them.

Race based restrictions on training are unlawful. *See, Pettway v. American Cast Iron Pipe Company,* 494 F.2d 211 (5th Cir. 1974), *reh. denied,* 494 F.2d 1296 (5th Cir. 1974); *Clark v. American Marine Corp.,* 304 F.Supp. 603 (E.D.La.1969). Brazer claims St. Regis acted unlawfully when it did not send him to Tour Foreman training. The evidence does not show or even hint at racial discrimination. There was no statistical discrepancy between the number of blacks and number of whites offered training. And St. Regis had a completely legitimate reason for sending just two of the four Tour Foremen to training school—the other two were needed to supervise the woodyard.

Brazer claims his transfer from Tour Foreman back to Payloader-Bulldozer Operator was completely racially motivated. Had he proved his claim, he would have established race discrimination. He did not, however, prove his claim. The change was made at Brazer's request. Furthermore, Brazer was replaced by a black, which means the change could not have been racially motivated. *See, DeVolld v. Bailar,* 568 F.2d 1162 (5th Cir. 1978), *reh. denied,* 570 F.2d 1391 (5th Cir. 1978).

Brazer's claim that because of his race St. Regis applied a different and more severe disciplinary standard to him than to white employees, if proved, would also entitle him to relief. Again he has not proved his claim. The incidents he complains of were his chastisement for insubordination when he was fueling at the wrong pump, the suspension for refusal to operate both payloaders, the warning for his April absences, the reprimand for his May absences, and his discharge. The evidence does not show any racial motivation for those incidents, and there is no evidence Brazer's treatment differed from that whites received.

Brazer relies mostly heavily on the treatment of a white employee, Dennis Schud-

lich, who was suspended for three days for telling his supervisor he was full of shit. Like Brazer's statement to C. J. Johnson, this was using profane and abusive language to a supervisor. The language, however, was less severe and the circumstances different. A dismissal would have been taken through the grievance proceeding. Unlike Brazer's comment, the remark was not witnessed and Schudlich denied making the comment. These evidentiary problems caused St. Regis to conclude it could not win a grievance proceeding and to reluctantly settle for suspension rather than dismissal. Brazer's treatment was not disparate, assuming some valid conclusion could be made by only considering one disciplinary incident involving a white. Furthermore, St. Regis' varying treatments of Brazer and Schudlich were for valid reasons.

Brazer's claim that he was denied overtime because of his race was also not proven. All the employees who would have received overtime Brazer was denied were black. The denial, therefore, could not have been racially motivated. As a matter of fact, St. Regis was simply honoring an old, long-followed agreement entered into for an employee's benefit with Union approval.

Brazer has also claimed every disciplinary incident after October, 1976, his discharge, and the denial of overtime were retaliation for him filing a charge with the Equal Employment Opportunity Commission. Once again the facts do not support the claim. All the actions Brazer complains of were taken for valid, legitimate, nondiscriminatory reasons. As evidence of retaliatory motives, he testified to Joe Hall showing him the notice of the EEOC charge and asking him what it was about. I do not find Brazer's testimony credible. His shop steward at the time, L. A. Jones, was also present. He testified Brazer had been summoned to Hall's office because of a mistake in payroll deductions for a savings bond. In addition to Brazer's general lack of credibility, which will be discussed later, the timing of the alleged questioning about the EEOC charge, the timing of the alleged

incident makes Brazer's testimony difficult to believe. Brazer filed his EEOC charge in October of 1976, and St. Regis received notice that month. Hall, according to Brazer, asked him about the charge in March of 1977. If questioning occurred, it would have been much sooner; the four-month delay between notice and questioning is unnaturally long.

Brazer's testimony in general was not convincing. He was evasive and obviously trying to say whatever best helped his cause as he understood it. Brazer was effectively impeached with prior inconsistent statements. On the stand he exhibited many of the traits St. Regis disciplined him for. He was rude, unwilling to follow instructions, belligerent, and in the words of Keeler, "had a chip on his shoulder."

Brazer's remaining allegations, the Donoroma charge, the uncooperative mechanic charge, and the failure to call a Union mechanic deserve only brief mention. His speculations about racial motivations for these incidents are totally unfounded. And there is not even evidence that anything untoward occurred in any of the incidents.

The Clerk shall enter a judgment for each Defendant and shall access all lawful costs against the Plaintiff.