REGENTS OF the UNIVERSITY OF
MINNESOTA et al., Appellees,

v.

The NATIONAL COLLEGIATE ATHLET-
IC ASSOCIATION, Appellant.

No. 77–1028.

United States Court of Appeals,
Eighth Circuit.

Submitted May 19, 1977.

Decided Aug. 2, 1977.

John J. Kitchin, Kansas City, Mo. (argued), and George H. Gangwere, Kansas City, Mo., and Wright W. Brooks, Minneapolis, Minn., on brief, for appellant.

Joe A. Walters, Minneapolis, Minn. (argued), and Thomas A. Keller, III, R. Joel Tierney, and Henson & Efron, Minneapolis, Minn., on brief, for appellees.

Joseph M. Goldberg, Minneapolis, Minn., for amici Thompson and Saunders.

David C. Forsberg and Peter W. Sipkins, St. Paul, Minn., for amicus Winey.

Before VAN OOSTERHOUT, Senior Circuit Judge, and BRIGHT and WEBSTER, Circuit Judges.

VAN OOSTERHOUT, Senior Circuit Judge.

This is an interlocutory appeal, pursuant to 28 U.S.C. § 1292(a)(1), from an order of the United States District Court for the District of Minnesota granting plaintiff Regents of the University of Minnesota, a corporate entity commonly and herein referred to as the University, and certain University personnel a preliminary injunction directing the defendant National Collegiate Athletic Association (the Association) to lift an indefinite probation imposed on the University's athletic teams and to refrain from imposing further sanctions on the University until the legal dispute between the parties is resolved on the merits.

The dispute arises out of the University's refusal to declare student basketball players Michael Thompson, David Winey and Philip Saunders ineligible. The University, predicating its action primarily upon 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3), maintains in essence that it could not declare the students ineligible consistently with its alleged constitutional duty to afford the students due process of law and that the Association, in seeking to require the University to declare the students ineligible and in imposing sanctions upon the University because it refused to do so, has interfered with that duty.[1] The association maintains, *inter alia*, that the University could have declared the students ineligible consistently with due process and that it was contractually bound to do so under certain Association rules.

The district court, in an opinion reported at 422 F.Supp. 1158 (D.Minn.1976), concluded that the University had shown a strong probability of success on the merits and that it would be irreparably harmed if a preliminary injunction were not issued. It accordingly issued the preliminary injunction, which the Association now appeals.

---

1. Thompson, Winey and Saunders as *amici curiae* have filed a brief advancing arguments similar to those advanced by the University.

Because we disagree with the district court's conclusion that the University has shown a strong probability of success on the merits, we dissolve the preliminary injunction.

I.

The pertinent facts are largely undisputed and commendably documented. They are, however, extensive. We emphasize at the outset that our review of the record serves only to facilitate our determination of the likely outcome when the matter is ultimately tried and is not intended as a complete and definitive recitation of the controlling facts. The district court on remand will of course retain its normal fact-finding authority, including the authority to receive such evidence, whether or not in the present record, as the parties may properly offer.

A. *The NCAA and pertinent NCAA rules.*

The NCAA is an unincorporated association of approximately 830 members. Its active members are four-year colleges and universities located throughout the nation, of which approximately half are governmentally supported. Association policies are established by its members at annual conventions and are directed between conventions by an elected eighteen-member Council. The Association publishes annually a manual which includes, *inter alia*, its constitution and bylaws, official interpretations thereof and enforcement procedures. The University of Minnesota is a member institution.

The Association does not itself declare student-athletes ineligible, but its rules do require member institutions to take such action in specified circumstances. Under Association constitution 4–2–(a), members agree "[t]o administer their athletic programs in accordance with the Constitution, the Bylaws and other legislation of the Association[.]" Official interpretation 18, immediately following this constitutional provision in the manual, states:

If a student-athlete is ineligible under the terms of the Constitution, Bylaws or other legislation of the Association, the institution shall be obligated immediately to apply the applicable rule to the student-athlete and withhold him from all intercollegiate competition. Subsequent to this action, the member institution may appeal to the NCAA Council, or a subcommittee designated by the Council to act for it, if the member concludes that the circumstances warrant restoration of the student-athlete's eligibility.

Under official enforcement procedure 9, a member's failure "to take appropriate action" on eligibility matters subjects the member to disciplinary sanction.

The specific eligibility standards of direct relevance here are those set out in NCAA constitution 3–1–(a)–(3)[2], 3–1–(g)–(6)[3], and 3–4–(a)[4], all of which concern impermissible payments and other benefits to student-athletes. Insofar as pertinent, each has remained in effect at all times material.

**2.** NCAA constitution 3–1–(a)–(3) in pertinent part provides: "(a) A student-athlete shall not be eligible for participation in an intercollegiate sport if: * * * * (3) He has directly or indirectly used his athletic skill for pay in any form in that sport[.]"

**3.** NCAA constitution 3–1–(g)–(6) in pertinent part provides: "(g) The following practices shall constitute 'pay' for participation in intercollegiate athletics and are expressly prohibited: * * * * (6) Special arrangements designed to provide a student-athlete, his relatives or other friends with extra benefits not made available to members of the student body in general or their relatives or other friends. Special arrangements specifically prohibited include, but are not limited to: special discounts or payment arrangements on purchases; loans without interest; guarantees of bond; regular or periodic use of an automobile without (or at a reduced) charge; transportation to or from the site of a summer job without (or at a reduced) charge. * * * "

**4.** NCAA constitution 3–4–(a) in pertinent part provides: "(a) Any student-athlete who receives financial assistance other than that administered by his institution shall not be eligible for intercollegiate competition, except as provided in Constitution 3–1–(b), and except where: * * * (2) Assistance is awarded solely on bases having no relationship to athletic ability[.]"

B. *The University's investigation and Thompson's complimentary ticket sale.*

The impasse ultimately reached between the parties was the result of a long series of events essentially beginning with an official "Letter of Inquiry" dated July 21, 1975, from the Association's Committee on Infractions to University President C. Peter Magrath. The letter, following a wide-ranging preliminary investigation by the Association into the University's basketball program, forwarded a list of 98 alleged violations of NCAA rules and solicited the University's response thereto.

The University promptly retained the services of an attorney for the purpose of conducting its own investigation, advising him that there were "absolutely no restraints on [his] inquiry" and specifically instructing him to report any discovered infractions, whether or not included in the Association's allegations. Also participating in the University's investigation was its Assembly Committee on Intercollegiate Athletics (ACIA), a faculty committee charged with overseeing intercollegiate athletics. There appears to be no dispute that the University's investigation was a thorough one.

On September 25, in the course of the investigation, Michael Thompson admitted he had sold his two 1974–75 complimentary season tickets, with a face value of $78, for a price of $180. Subsequent investigation revealed that he had previously signed a statement that complimentary ticket sales were a violation of Big Ten Conference rules and that the sanction for violation was ineligibility.[5] In October, upon being informed that the sale might be contrary to NCAA and Big Ten rules, Thompson donated $180 to a University scholarship fund.[6] The Thompson ticket sale was not among the violations enumerated in the July 21 Letter of Inquiry.

By letter dated November 26, the ACIA informed Thompson that his ticket sale appeared to violate NCAA rules and that he could appear before an ACIA hearing panel; the letter advised that ACIA "ha[d] specifically excluded recommending ineligibility from participation in basketball (the sanction mandated by the NCAA C[onstitution] 3–1–(a)) as a possible punishment." On the advice of an ACIA faculty member that it would be pointless for him to attend the hearing, Thompson chose not to do so.

Following some sort of hearing on December 5, the ACIA issued its findings on the Thompson matter on December 9. Noting his own admission of sale, ACIA determined: "This clearly violates the principle that an amateur athlete should not profit from his or her athletic ability. The NCAA regulations are quite specific on this point: they require that the athletes involved be declared ineligible to compete." Nevertheless, the ACIA concluded that, unless evidence was adduced showing the violation to have been "far more flagrant than does the present evidence", the penalties to be imposed would be restricted to restitution and withdrawal of the complimentary ticket privilege. The ACIA emphasized that Thompson had admitted the sale, that the practice was widespread, and that primary responsibility for the practice should be borne by the members of the coaching staff, who "allowed representatives of athletic interests into the locker room to transact sales or directly involved themselves in such

---

5. The NCAA takes the position that its rules prohibit the sale of complimentary tickets for more than face value. The Big Ten rule is stricter, prohibiting any sale of the tickets. The Big Ten, however, has restored Thompson's eligibility. See note 11, *infra.*

The statement signed by Thompson reads as follows:

*BIG. TEN CONFERENCE AGREEMENT*: "The Conference has reaffirmed a policy that complimentary tickets issued to athletes are a courtesy designed to permit their friends and families to see them and their teams in competition. The sale of complimentary tickets is an abuse of privilege, and is to be viewed as a form of unauthorized financial assistance subjecting an athlete who does so to ineligibility."

My signature verifies that I have read the above and agree to comply with Conference regulations regarding complimentary tickets. SIGNATURE: /s/ Michael Thompson

6. Thompson did not recall the identity of the purchaser.

sales." It observed that other students, equally culpable but more circumspect when questioned, were not subject to discipline. In sum, it concluded that ineligibility was a grossly unfair sanction.

## C. The University's response to the Letter of Inquiry.

In contemplation of a December 18, 1975, hearing before the Association's Committee on Infractions, the University submitted its formal response to the July 21 Letter of Inquiry. The response, which consumed 546 pages, disclosed approximately 33 possible infractions of Association rules in addition to those originally cited by the Association, among them Thompson's complimentary ticket sale. The ACIA findings with respect to Thompson were apparently included as a supplement to the response. The remainder of the response is pertinent only insofar as it concerns David Winey and Philip Saunders.

The response advised that Winey had on two occasions in 1974–75, the first through the arrangements of assistant basketball coach Kevin Wilson, been transported to northern Wisconsin by Paul Johnson, a member of a University basketball booster group, and was there provided with meals, lodging and entertainment at a cabin owned by Johnson. The response further advised that Johnson had on occasion extended similar amenities to other students who were not athletes.

With respect to Saunders the response detailed the circumstances of three incidents which ultimately proved to be significant. First, during the 1973–74 academic year, Saunders, "to some extent with the knowledge and assistance of" assistant coach Wilson, was permitted to place long distance telephone calls to his parents or friends on a WATS line in a downtown Minneapolis office.[7] Second, in summer 1974 he was permitted to use the automobile of Wilson's mother-in-law, Mrs. Kienzel, without charge,[8] to provide transportation to prospective student-athletes from Minneapolis to St. Peter, Minnesota, the site of head basketball coach Bill Musselman's summer basketball camp.[9] Third, in summer 1974, through the arrangements of Musselman, Saunders was provided cost-free room for one night at Gustavus Adolphus College in St. Peter. To a large extent, each of the circumstances had been learned from Saunders himself.

## D. The Association's insistence that Thompson be declared ineligible.

The University's response to the Letter of Inquiry was considered by the Association's Committee on Infractions [10] at the December 18, 1975, hearing. During the hearing the University was advised that it was obligated to declare Thompson ineligible under Association constitution 3–1–(a)–(3), 3–1–(g)–(6) and 4–2–(a). Association officials also explained that, under official interpretation 18, the University could, upon declar-

7. The response advised that arrangements had been made to use the WATS line for recruiting purposes, in which students had assisted, but that the arrangements had been widely abused. Of the students using the line for personal purposes, only Saunders had remaining eligibility following the investigation. Saunders had indicated he was at the office on at least three occasions, but the actual number of calls made was uncertain.

8. The response advised that the University had received conflicting accounts as to whether Saunders had reimbursed Mrs. Kienzel for the gasoline used and, if so, whether Saunders had himself been reimbursed from basketball camp funds.

9. According to the response, Saunders had stated that because of his close relationship

with Wilson and Wilson's family, he felt he had asked a friend, rather than a coach, for use of the car. Saunders and Wilson had both stated that Wilson did not arrange for the use of the car, although a third party had stated his belief to the contrary.

10. The members of this committee in attendance at the hearing were: Arthur Reynolds, Dean, Graduate School, University of Northern Colorado; Harry M. Cross, Professor of Law, University of Washington; William L. Matthews, Jr., Professor of Law, University of Kentucky; Charles Alan Wright, Professor of Law, University of Texas; and John W. Sawyer, Professor of Mathematics, Wake Forrest University.

ing him ineligible, appeal to the Association's Subcommittee on Eligibility Appeals for restoration of eligibility based upon the mitigating circumstances allegedly present.

On January 7, 1976, following its holiday recess, the University notified Thompson of the Association's position with respect to his eligibility, informed him that a second hearing before ACIA would be held on January 12, and advised him that he could appear personally or by counsel at the hearing. He was further informed that if the hearing resulted in a declaration of ineligibility the University would immediately appeal to the Association for restoration and that the appeal would likely be successful. On January 12, Thompson signed a waiver of his right to attend the hearing. The hearing resulted in a declaration of ineligibility; as a consequence, Thompson did not play in a January 17 University basketball game.

By letter dated January 12 the University appealed to the Subcommittee on Eligibility Appeals for restoration of Thompson's eligibility. The letter reiterated, and to some extent supplemented, the ACIA's concerns as originally expressed on December 9. It noted, however, that "prior to the 1975–76 NCAA Handbook, there was no case report of a ruling regarding professionalism (play for pay) associated with ticket sales", a statement apparently indicating that the ACIA was receding from its December 9 position that sales in excess of face value were clear violations.

The University's appeal was heard on January 15. The Subcommittee on Eligibility Appeals reduced the penalty against Thompson from permanent ineligibility to ineligibility for the remainder of the 1975–76 schedule (by the Association's calculations, at least fourteen games). Immediate restoration was denied. The University appealed the Subcommittee's decision to the NCAA Council, which heard the appeal on

11. The University had utilized similar procedures to obtain restoration of Thompson's eligibility from the Big Ten Conference. On January 16, these efforts had proved successful. See note 5, *supra*.

12. CCSB is a committee of students, faculty and staff appointed by the President of the

January 18 and that date sustained the Subcommittee's ruling.[11] Thompson was present at this appeal.

### E. *The state court preliminary injunction.*

On January 18, 1976, Thompson filed a complaint in a Minnesota state court against the University alleging that the University's declaration of ineligibility violated his right to due process. The state court on that date issued a temporary restraining order against enforcement of the declaration. On February 10, following a court hearing, a preliminary injunction was issued whereby the University was enjoined from prohibiting Thompson's participation in intercollegiate athletics until such time as a hearing meeting specified minimum due process standards was held.

In essential particulars, the state court concluded that Thompson had a property interest in participation in inter-collegiate athletics, that his waiver of appearance at the December 5 ACIA hearing was induced by erroneous University representations that ineligibility was not a potential sanction, that his waiver of appearance at the January 12 ACIA hearing was induced by erroneous University representations that the University's appeal of the declaration of ineligibility to the Association would likely be successful, and that the waivers were accordingly without legal effect and void.

In compliance with the court orders, the University allowed Thompson to rejoin the basketball team and scheduled a third hearing. The third hearing, however, was not scheduled initially before the ACIA, as the first two had been. Rather, the University employed a two-tiered process under which initial factfindings were to be made by the University's Campus Committee on Student Behavior (CCSB),[12] with the ultimate decisionmaking authority resting in ACIA.

University and charged with administering the University's conduct code. The reason assigned by the University for its referral of the Thompson case to CCSB was the University's determination that the NCAA violation alleged was also a violation of the conduct code.

F. *Confidential Report No. 111(35) and the University's acceptance thereof.*

On February 23, 1976, before the CCSB hearing was conducted, the University received "Confidential Report No. 111(35)", dated February 19, from the Association's Committee on Infractions. This document, which constituted the Committee's formal response to the entire matter considered at the December 18 hearing, reported a total of 122 violations of Association rules and proposed a number of penalties, among them a three-year probation, including a two-year ban on postseason play and television appearance in basketball, and a two-year restriction on athletic scholarships in basketball.

Among the violations listed in the report were Thompson's sale of complimentary tickets (violation I–A–8), Winey's excursions to northern Wisconsin (violation I–D–8), Saunders' use of the WATS line (violation I–D–6), Saunders' use of Mrs. Kienzel's automobile (violation I–E–1), and Saunders' cost-free overnight lodging at Gustavus Adolphus College (violation I–J–1).[13]

With specific reference to violations I–A–8, I–D–6, I–D–8, I–E–1, and I–J–1, the report advised:

Constitution 4–2–(a)—O[fficial] I[nterpretation] 18 and Section 9 [of the enforcement procedures] require immediate application of NCAA rules by the institution to the eligibility of the student-athlete; however, the opportunity for an institutional hearing may be extended to the student-athlete prior to such application, it being understood that he shall not be permitted to participate in intercollegiate competition prior to restoration of his eligibility upon appeal to the NCAA Council, its Subcommittee on Eligibility Appeals, or both.

A letter forwarding the report explained that the report's findings and proposed penalties could be appealed to the Council.

By letter dated March 4 from President Magrath the University accepted the findings and proposed penalties of Confidential Report No. 111(35). The letter in pertinent part reads:

Although we believe the findings to be occasionally inaccurate, in our judgment the findings of the National Collegiate Athletic Association and the University are, in the main, corroborative. Even if certain findings were deleted, we agree that the remainder would warrant imposition of penalties.

Accordingly, the University of Minnesota accepts the report of the National Collegiate Athletic Association and this letter is to inform you of our decision to waive further appeal.

The University does not now contest the penalties imposed by Confidential Report No. 111(35).

G. *The proceedings before CCSB and ACIA.*

The University, taking the position that it was legally obligated to afford a due process hearing to Saunders and Winey as well as Thompson, scheduled hearings before the CCSB on March 9 for Saunders, March 11 for Thompson, and March 18 for Winey. The CCSB reduced its findings to writing and forwarded them to the ACIA, which conducted its own hearing on May 4 and subsequently reduced its findings to writing. The three students were represented by counsel at both hearings, which the district court found to be fair and impartial. As a result of these procedures, ACIA determined not to declare the students ineligible.

In general the CCSB and ACIA findings conformed to the underlying facts as charged by the Association but set forth allegedly exculpatory or mitigatory circumstances which purportedly rendered ineligi-

---

**13.** Each of these violations cited NCAA constitution 3–1–(g)–(6); the Thompson violation also cited constitution 3–1–(a)–(3); the I–J–1 violation by Saunders also cited constitution 3–4–(a). The texts of these provisions are reproduced at notes 2–4, *supra*.

The report cited as a further violation (I–P–1), under NCAA constitution 4–2–(a), the University's failure to declare Thompson ineligible after determining that he had received improper benefits.

bility an inappropriate sanction. With respect to Thompson, the findings were in large measure a repetition of the ACIA's position as previously expressed on December 9 and January 12. It was concluded at this time, however, "that there was no validly expressed NCAA rule prohibiting the sale of complimentary tickets for more than face value" until January 1975, one month after Thompson's sale. The conflict with ACIA's own December 9 statement that such sales clearly were violations is apparent.

With respect to Winey, CCSB and ACIA noted Winey's own admissions that he had twice accepted invitations to Johnson's cabin. Further noting, however, that it was common practice for faculty and friends of the University to invite students to their homes and that Johnson had previously invited another student, not an athlete, to his home, ACIA concluded there had been no violation of NCAA rules.

With respect to Saunders, it was determined that he had made between two and six calls to his parents on the WATS line. It was also determined that the primary purpose of the calls was to assist in recruiting; according to CCSB the extent to which the calls were social or personal "could not be determined from the available evidence." The fact that Saunders had borrowed Mrs. Kienzel's automobile was again freely admitted, but it was emphasized that Saunders and Mrs. Kienzel had known each other for nearly ten years and that at least one reason for the trip was to deliver certain items to Mrs. Kienzel's son. ACIA concluded "that Saunders had use of the car because of a long-standing family relationship, not because he was a student-athlete; the 'aid' was made available in conformity with the pertinent NCAA constitutional provision (3–4–(a)–(2))." Saunders' overnight stay at Gustavus Adolphus College was likewise again admitted, but ACIA found no violation "because the evidence provided no grounds for asserting that free room had been made available to a student-athlete that was not also available to a student who was not an athlete."

The overriding sentiment expressed throughout the findings of both CCSB and ACIA was dismay over the only sanction available—ineligibility—if violations were found. The findings are replete with statements that the violations, if any, were neither gross or flagrant nor knowing and willful. They also stress the general laxness on the part of the coaching staff and would seemingly place primary responsibility for any irregularities on the staff. Finally, they counter-charge that the Associations' rules are complicated, unclear and unevenly applied.

On May 6 President Magrath confirmed in writing to the Association that the University would not declare the students ineligible. The correspondence which ensued quickly unveiled an impasse.

The Association's position was stated in a letter to Magrath dated June 25. The letter recited that the responsibility and authority for interpreting Association rules rested with the Association: "[t]o permit an individual institution to retain either the interpretive or enforcement authority could and probably would result in as many interpretations and types of enforcement as there are member institutions." Since the University had, under date of March 4, accepted the violations as charged in Confidential Report No. 111(35), it had no alternative but to declare the students ineligible. The University was advised that the findings in the report could be challenged at that late date only by a request to the Committee on Infractions based on newly discovered evidence.

On July 7 the University requested a hearing on the basis of newly discovered evidence. The request was granted on July 30, and a hearing was scheduled for August 21. Also to be considered at the hearing were whether the University had violated Association constitution 4–2–(a) and official interpretation 18 by allowing Thompson, Winey and Saunders to participate in competition during the 1975–76 season while ineligible and whether, if so, additional penalties should be imposed on the University.

The August 21 hearing was conducted as scheduled. Thompson, Winey and Saunders had been invited to appear but declined to do so.

H. *Confidential Report No. 118(42) and the University's appeal thereof.*

On September 10, 1976, the University received Confidential Report No. 118(42), dated September 8, from the Committee on Infractions.[14] A forwarding letter relayed the Committee's conclusion that newly discovered evidence presented at the August 21 hearing was not sufficient to overturn or alter the original findings in the February 19 Confidential Report No. 111(35) with respect to the three students. Confidential Report No. 118(42) listed two (new) violations of NCAA constitution 4–2–(a), both concerning the University's failure to declare the students ineligible. These were:

I–A–1. The University did not apply the applicable provisions of the NCAA Constitution to the eligibility of student-athletes Phil Saunders and David Winey and withhold them from competition for the remainder of the 1975–76 intercollegiate basketball season after notifying the NCAA under date of March 4, 1976, that the University would not appeal the findings of violations of the NCAA Constitution related to the eligibility of the young men set forth in Confidential Report No. 111(35).

I–A–2. Under date of May 4, 1976, the University determined that it would not in the future apply the applicable provisions of the NCAA Constitution . . . to the eligibility of student-athletes Phil Saunders, Michael Thompson and David Winey; further, information considered by the University in reaching its decision concerning the eligibility of these student-athletes has been reviewed by the Committee on Infractions, which has concluded that the findings of violations of

the NCAA Constitution contained in Confidential Report No. 111(35) remain in effect and applicable to the eligibility of the young men; finally, the University continues to disregard its conditions and obligations of membership by not properly applying the NCAA legislation determined through the Association's normal procedures to be applicable to the eligibility of Saunders, Thompson and Winey.

In addition, Confidential Report No. 118(42) listed as a "questionable practice" the University's utilization of procedures in the Thompson case following the February 10 court order which resulted in that case not being resolved by the University until after the March 6 close of the basketball season.

As a consequence of the above findings, Confidential Report No. 118(42) set forth additional proposed penalties to be imposed on the University.[15] These penalties, which are the *raison d'etre* of this lawsuit, are public reprimand and censure and an indefinite period of probation in all sports "until such time as the University demonstrates and so certifies that it is conducting its intercollegiate athletic program in accordance with all requirements and interpretations of NCAA legislation." The probationary period includes a ban on post-season play and television appearance in all sports.

The report did state that, upon certification that the University was properly conducting its athletic program, the penalties imposed by Confidential Report No. 118(42) would be reconsidered by the Committee on Infractions. It also noted, in accordance with Confidential Report No. 111(35), that once the University declared the three students ineligible it could in an eligibility appeal request restoration of eligibility.

By letter dated September 24, in accordance with Association procedures, the University appealed the findings and proposed penalties of Confidential Report No. 118(42)

---

14. An "expanded" Confidential Report No. 118(42) was prepared when the University appealed the Committee's findings to the Council and was forwarded to the University on October 8. Our discussion is of the report as expanded.

15. The report stated: "The primary reason for the penalties is the finding set forth in Part I–A–2 of this report."

to the NCAA Council. The appeal was heard on October 12. Thompson, Winey and Saunders were invited to attend at University expense [16], but declined to do so. By telephone conversation of October 13, as evidenced by letter dated October 23, the NCAA Council notified the University that it affirmed the findings and penalties of the Committee on Infractions. It re-emphasized, however, "that if the University of Minnesota applies the applicable provisions of the NCAA Constitution to the eligibility of the young men in question and then certifies that it is conducting its intercollegiate athletic program in accordance with all requirements and interpretations of NCAA legislation, the penalties in this case will be reconsidered by the Committee on Infractions and reduced or eliminated." It also re-emphasized that once the three students were declared ineligible the University could seek restoration of eligibility from the Association.

The complaint in this lawsuit was filed on October 26, 1976. The University seeks declaratory and injunctive relief, primarily with respect to the penalties imposed by Confidential Report No. 118(42).

## II.

Before considering the merits of the claim asserted by the University, we address a number of preliminary contentions advanced by the Association. Two contentions are advanced under the general heading of standing. First, it is argued that the corporate plaintiff, the Regents, is not a "person" within the meaning of 42 U.S.C. § 1983. Second, it is argued that the individual plaintiffs, members of the Regents and members of ACIA, fail to meet traditional standing requirements. The Association also contends that its activities do not constitute "governmental action" as required under the fourteenth amendment and § 1983.

16. This use of University funds had been expressly sanctioned by the Association.

17. We have reached a contrary conclusion with respect to a local school district and a high school athletic association. *Keckeisen v. Inde-*

## A.

We do not decide whether the corporate Regents is a proper party plaintiff. The Association's argument traces to *Monroe v. Pape*, 365 U.S. 167, 81 S.Ct. 473, 5 L.Ed.2d 492 (1961), in which the Supreme Court held a municipality not subject to suit under 42 U.S.C. § 1983 because it was not a "person" within the meaning of that statute. The Court subsequently made clear that this holding applies to actions for equitable relief as well as to those for damages. *City of Kenosha v. Bruno*, 412 U.S. 507, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Most recently, in *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 277 – 279, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Court posed, but did not answer, two questions concerning the appropriate scope of *Monroe v. Pape*: (1) whether the defendant local school board was a "person" within the meaning of § 1983 and (2) whether, if not, a claim could nonetheless be implied directly under the fourteenth amendment, thereby conferring federal jurisdiction under 28 U.S.C. § 1331 without regard to the limitations imposed by § 1983.

■ It is settled in this circuit that public universities and their corporate boards of regents, as political subdivisions of the state, may not be sued under § 1983 since they are not persons within the meaning of § 1983. *Prostrollo v. University of South Dakota*, 507 F.2d 775, 777 n. 1 (8th Cir. 1974), *cert. denied*, 421 U.S. 952, 95 S.Ct. 1687, 44 L.Ed.2d 106 (1975).[17] The case presently before us, however, presents the novel proposition whether *Monroe v. Pape* and its progeny, of which *Prostrollo* is one, apply to "persons" plaintiff as well as to "persons" defendant. While the rationale of *Monroe v. Pape*, that Congress did not intend to subject municipalities to liability, arguably raises some doubt about the mat-

*pendent School Dist. 612*, 509 F.2d 1062, 1065 (8th Cir.), *cert. denied*, 423 U.S. 833, 96 S.Ct. 57, 46 L.Ed.2d 51 (1975); *Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 27–28 (8th Cir. 1974).

ter, there is surely merit in suggesting that the same word twice used in the same statute was intended to have the same meaning. *See Akron Bd. of Educ. v. State Board of Educ.*, 490 F.2d 1285 (6th Cir.), *cert. denied*, 417 U.S. 932, 94 S.Ct. 2644, 41 L.Ed.2d 236 (1974) (all three opinions). Nevertheless, even if we were to decide that the corporate Regents of the University of Minnesota is not a proper plaintiff under § 1983, we would still be presented with the exceedingly difficult question posed in *Mt. Healthy Board of Education v. Doyle, supra, viz.*, whether a claim could be implied directly under the fourteenth amendment with consequent jurisdiction under § 1331.[18] *See also Wright v. Arkansas Activities Ass'n*, 501 F.2d 25, 28 (8th Cir. 1974). We, like the Supreme Court, defer resolution of these questions to another day. We do so because we are satisfied that the individual plaintiffs may properly bring this action.

### B.

*Monroe v. Pape* does not, of course, prevent the maintenance of this action by the individual plaintiffs, and the Association does not contend to the contrary. The Association does contend, however, that these plaintiffs have shown no injury to themselves, that the rights being asserted are those of the student-athletes, and that the individual plaintiffs accordingly fail to satisfy traditional standing requirements.

■ Although standing in no way depends on the merits of the plaintiffs' contention that particular conduct is illegal, it often turns on the nature and source of the claim asserted. *Warth v. Seldin*, 422 U.S. 490, 500, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). The essence of the claim sought to be asserted here is (1) that the plaintiffs had a constitutional duty to afford minimum due process to the student-athletes before declaring them ineligible and (2) that the Association interfered with the performance of this duty by insisting that plaintiffs take actions inconsistent with the

duty. This claim, while somewhat novel, does find colorable support in our cases, for we have recognized, in at least some contexts, that persons charged with the performance of a constitutional duty have, in their personal capacity, a correlative right to be free from interference with the performance of that duty. *Brewer v. Hoxie School Dist. No. 46*, 238 F.2d 91, 98–101 (8th Cir. 1956); *see Park View Heights Corp. v. City of Black Jack*, 467 F.2d 1208, 1213–1214 (8th Cir. 1972). It is with this precedent in mind that we examine the standing argument.

■ The Supreme Court has reiterated time and again that a party's standing to maintain a federal action involves both constitutional limitations on the court's jurisdiction and prudential limitations on its exercise. *Arlington Heights v. Metropolitan Housing Dev. Corp.*, 429 U.S. 252, 260, 97 S.Ct. 555, 52 L.Ed.2d 450 (1977). In its constitutional dimension, the essence of the standing question is whether the plaintiffs have alleged such a personal stake in the outcome of the controversy as to warrant their invocation of federal-court jurisdiction and to justify exercise of the court's remedial powers on their behalf. *Id.* The plaintiffs must show that they themselves are injured by the challenged action of the defendant; the injury may be direct or indirect, but the complaint must indicate that the injury is indeed fairly traceable to the defendant's acts or omissions. *Id.*

■ The individual plaintiffs before us, who are members of the Regents (President Magrath among them) and members of ACIA, satisfy this criterion. Under procedures established by the Association, it is they who bear the responsibility of declaring or not declaring a student-athlete ineligible. It is their own personal rights which, under *Brewer v. Hoxie School District No. 46, supra*, they claim have been violated. And the consequences which have been visited upon them as a result of the alleged violation are anything but speculative or hypothetical, for, absent judicial interven-

---

18. The complaint so alleges.

tion, they face the grim prospect of either declaring the student-athletes ineligible, and thereby transgressing their own view of their constitutional obligations, or capitulating to the severe sanctions imposed by Confidential Report No. 118(42)—in either event without court guidance as to the correctness or incorrectness of their own view of the constitutional obligations imposed on them. *See Board of Education v. Allen*, 392 U.S. 236, 241 n.5, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968). Most certainly, they would derive an appreciable benefit from a favorable judgment in this action, as they would no longer be confronted with the above dilemma. *Cf. Warth v. Seldin, supra*, 422 U.S. at 507–08, 95 S.Ct. 2197. Finally, the consequences just described are unmistakably the result of actions taken by the Association. *Cf. id.* at 505–07, 95 S.Ct. 2197. We conclude that the constitutional requirement is satisfied.

Of the prudential restraints on a party's invocation of federal jurisdiction, only one is argued to be relevant. Ordinarily, a party is denied standing to assert the rights of third parties. *Arlington Heights v. Metropolitan Housing Dev. Corp., supra*, 429 U.S. at 263, 97 S.Ct. 555, at 562. It is true, of course, that plaintiffs here seek to assert the rights of student-athletes Thompson, Winey and Saunders. As our above comments make clear, however, their attempt to do so forms an integral part of their attempt to assert their own constitutional right. In *Brewer v. Hoxie School Dist. No. 46, supra* at 104, we specifically held normal *jus tertii* rules inapplicable "where the identity of interest between the party asserting the right and the party in whose favor the

right directly exists is sufficiently close." *See also Park View Heights Corp. v. City of Black Jack, supra* at 1213. While this particular formulation of the appropriate test should probably be re-examined in light of the several opinions filed in *Singleton v. Wulff*, 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976), *see Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861, at 865 n.3 (8th Cir. 1977), such re-examination is not warranted in this case, for we do not read any of the opinions in *Singleton* as suggesting that prudential considerations foreclose the assertion of a third party's rights as an integral part of one's own. The dissenting Justices in *Singleton* agree "that a fundamental policy behind the general rule is a salutary desire to avoid unnecessary constitutional adjudication." 428 U.S. at 124 n.3, 96 S.Ct. at 2879 (Powell, J., dissenting in part). In the present case, an adjudication of the rights of the student-athletes is in every meaningful sense necessary to an adjudication of the constitutional controversy between the parties before us. To the extent this is so, the prudential considerations lose cogency and must yield.[19]

## C.

 Three courts of appeals have squarely held that Association activities do constitute governmental action for purposes of the Constitution and § 1983, and the First Circuit, in a recent opinion authored by Judge Van Oosterhout, has specifically stated its agreement with these decisions. *Howard University v. NCAA*, 166 U.S.App. D.C. 260, 510 F.2d 213 (1975); *Parish v. NCAA*, 506 F.2d 1028 (5th Cir. 1975); *Asso-*

**19.** Portions of the Association's standing argument are in reality directed to the merits of plaintiffs' asserted claim. For example, the Association argues: "Even assuming arguendo that a student has a federally protected right to play basketball . . ., the NCAA maintains that such right does not create in the plaintiff University a new federal right to decide the [eligibility] matter and to enforce its decision under the blanket of the federal Constitution." While the Association may of course maintain on the merits its strongly held belief that the University has in fact attempted to usurp the Association's authority to interpret its own

rules, and while it may be correct in this belief, that is not to say that plaintiffs are deprived even of standing to claim that what rather occurred was the Association's interference with plaintiff's alleged duty to the student-athletes. As already noted, standing in no way depends on the merits of the plaintiffs' contention that particular conduct is illegal. *Warth v. Seldin, supra*, 422 U.S. at 500, 95 S.Ct. 2197. Moreover, even if the claim asserted were entirely frivolous, and we cannot say that it is, the proper course would be a dismissal on the merits. *See Herald Co. v. McNeal*, 553 F.2d 1125, 1131 (8th Cir. 1977).

*ciated Students, Inc. v. NCAA*, 493 F.2d 1251 (9th Cir. 1974); *Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492 (1st Cir. 1977). We, like the First Circuit in *Rivas Tenorio, supra* at 495, agree with the analysis and conclusion of Judge Tamm for the District of Columbia Circuit in *Howard University, supra* at 216–20.[20]

### III.

We turn, then, to the merits of the claim asserted. The task before us, as the University[21] rightly contends, is a narrow one. The district court has considerable discretion in weighing the equities, and an order granting a preliminary injunction will be overturned only when the court has abused its discretion or otherwise committed an error of law. *Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861, at 866 (8th Cir. 1977); *Jones v. Snead*, 431 F.2d 1115, 1116 (8th Cir. 1970). Nevertheless, in order to justify the issuance of a preliminary injunction, the moving party has the burden of showing both substantial probability of success at trial and irreparable injury absent such issuance. *Planned Parenthood v. Citizens for Community Action, supra* at 866; *American Train Dispatchers v. Burlington Northern*, 551 F.2d 749, 751 (8th Cir. 1977). The Association, as appellant, directs its argument solely to the first of these two prerequisites, which is accordingly the sole one commanding our attention. .

### A.

The parties take extremely divergent positions in their characterizations of the events leading to the current impasse and in their statements of the pertinent issues. We begin with a brief synopsis of the views expressed by the court below.

The district court observed initially that the issue is not whether Thompson, Winey and Saunders have been denied due process, as they have received full and fair hearings and are in any event, as matters now stand, not aggrieved. 422 F.Supp. at 1160. The district court then recognized that the University has a contractual obligation to the Association "which it must honor absent a superior legal duty to the contrary." *Id.* It concluded, however, that the University had a superior legal duty, that being its constitutional obligation to afford the student-athletes a hearing before passing on their eligibility; this conclusion rested on the court's further determination that, under Minnesota law, the student-athletes had a property interest in intercollegiate basketball participation entitling them to protection under the fourteenth amendment. *Id.* at 1160–62.

Noting that the University had in fact conducted the hearings and reached "fully justifiable" conclusions on the basis thereof, the court stated: "[The University of] Minnesota and NCAA are bound by the findings. Minnesota properly could not later disavow the findings made by its committees in order to comply with its NCAA membership obligation to abide by NCAA rules and decisions. That would be to make a mockery of due process." *Id.* at 1162. Finally, the court concluded that the Association's imposition of the penalties in Confidential Report No. 118(42) transgressed upon the University's "legal duty to afford due process hearings to the athletes and to abide by the results", from which it followed that the University had made out a likely meritorious claim under *Brewer v. Hoxie School District No. 46, supra. Id.*

---

20. Judge Tamm concludes, *supra* at 220:

If the NCAA was composed of solely public institutions, clearly state action would be present. In contrast, if the NCAA had no public members, its actions would be private for constitutional purposes. Drawing the line as to the requisite quantum of public participation to invoke fourteenth amendment protections is a difficult task indeed. However, that is unnecessary in this case where the degree of public participation and entanglement between the entities is substantial and pervasive.

21. Except where greater specificity is deemed necessary, we collectively refer to the plaintiffs throughout the remainder of this opinion as the University. We do so solely for the sake of convenience and of course imply no departure from our disposition of the standing issues.

On appeal the Association contests the district court's reasoning at virtually every juncture. It is vigorously contended that the student-athletes have no constitutionally protected interest entitling them to a due process hearing. Even assuming that they do have such an interest, the Association maintains that they were afforded more than ample procedural protections, that they (as did the University) admitted the underlying facts of the charged infractions and that the district court's analysis should have ended with its initial conclusion that the student-athletes had received fair and impartial hearings. The University's position is characterized as an attempt to usurp for itself the authority to determine the applicability of Association eligibility rules, a position which, if sustained, would seriously undermine and probably eliminate any effective enforcement of the rules. It is argued that the University is not an impartial decisionmaker, that it is vitally interested in the continuing eligibility of its players, and that in contrast the Association's Committee on Infractions consists of a distinguished panel of jurisprudential scholars keenly sensitive to constitutional rights and beyond reproach as impartial decisionmakers.

The University's argument is equally multi-faceted. In addition to whole-heartedly endorsing the reasoning of the district court, the University draws our attention to numerous additional aspects of the controversy. Thus, it is argued that the student-athletes have at stake not only the property interest found by the district court but also a liberty interest in that the "stigmatizing" allegations against them were "highly publicized." The University also directs a wide-ranging assault upon the Association's eligibility procedures. It is charged that the outcome of the hearings which the Association permitted the University to conduct were "preordained" by the Association

as a consequence of prior procedures themselves unconstitutional; specifically, it is contended that the initial findings of violation were formulated on the basis of the December 18, 1975, hearing before the Committee on Infractions, which the student-athletes were not given an opportunity to attend, and which accordingly did not afford the Committee on Infractions an adequate factual basis for its determinations. The University counters the Association's suggestion that the University is a biased decisionmaker by noting the district court's conclusion that the hearings conducted by the University were fair and impartial.

B.

The above summary of the contentions advanced by the parties is not exhaustive. However, a plenary consideration of each of the contentions advanced is not necessary to a disposition of this appeal. We are convinced, at least on the basis of matters currently of record, that the University, as of May 4, 1976, could have declared each of the three student-athletes ineligible consistently with any constitutional duty it may have owed to them and, conversely stated, without violating any due process rights held by them. With this conclusion, the entirety of the University's unconstitutional interference claim necessarily falls, for it follows almost immediately that (1) the University's contractual obligation to declare the student-athletes ineligible was not subject to any superior constitutional obligation; and (2) the sanctions imposed by Confidential Report No. 118(42) were a legitimate consequence of Association rules established by contract and unimpaired by the Constitution.

Thus, for present purposes, we need not decide whether Thompson, Winey and Saunders had a property interest in intercollegiate basketball participation [22] or a

---

**22.** The correct resolution of this issue is uncertain, although we do note that two courts of appeals have held that participation in school athletics is not by itself a constitutionally protected property interest. *Albach v. Odle,* 531 F.2d 983, 984–85 (10th Cir. 1976); *Parish v.*

*NCAA,* 506 F.2d 1028, 1034 (5th Cir. 1975); *Mitchell v. Louisiana High School Athletic Ass'n,* 430 F.2d 1155, 1157–58 (5th Cir. 1970); *see Howard University v. NCAA,* 166 U.S.App. D.C. 260, 510 F.2d 213, 222 (1975). As noted by the district court, 422 F.Supp. at 1161, the

liberty interest in their good names[23] or both sufficient to invoke the guarantees of due process, whether the University had a consequent obligation to afford due process hearings, or whether any actions on the part of the Association which actually did constitute an interference with the University's obligation would be actionable on a reasoning similar to that of *Brewer v. Hoxie School District No. 46, supra.* We assume, without deciding, that the University is correct with respect to each of these issues and hold that there was in fact, on the present record at least, no such interference.

We similarly do not decide whether the Association's eligibility procedures could ever result in a meritorious claim by a member institution. Specifically, and of some importance, we do not decide whether the sanctions of Confidential Report No. 118(42) could legally have been imposed solely because the University failed to declare Winey and Saunders ineligible subsequent to March 4, 1976 (but prior to May 4, 1976), as stated in Part I–A–1 of Confiden-

tial Report No. 118(42), or solely because the University utilized procedures in the Thompson case following the February 10 court order which resulted in that case not being resolved at the University level until after the close of the then-current basketball season, cited as a questionable practice in Confidential Report No. 118(42). As noted in the margin,[24] these aspects of the controversy raise questions in addition to those raised by the University's refusal to declare the three student-athletes ineligible subsequent to May 4, 1976, the date by which all hearings before CCSB and ACIA had been completed and the pertinent date under finding I–A–2 of Confidential Report No. 118(42). See Part I(H) of this opinion, *supra.* Since we conclude that the Association is correct in maintaining that there were no constitutional impediments to declarations of ineligibility once the hearings were completed, and since the primary reason for the penalties imposed by Confidential Report No. 118(42) was the University's refusal to declare the student-athletes ineli-

Supreme Court of Minnesota has not decided whether such participation is a protected property interest under Minnesota law.

There is some indication in the caselaw that the continued maintenance of a scholarship may in some circumstances constitute a constitutionally protected property interest. *See Parish v. NCAA, supra,* at 1034 n.17; *Colorado Seminary v. NCAA,* 417 F.Supp. 885, 895 (D.Colo.1976). Here, however, the Association represents that it does not require a member institution to cancel financial aid when it declares a student-athlete ineligible. The University takes a contrary position, arguing that Association rules, by reference to Big Ten Conference rules, do require the member institution to cancel financial aid. The Association in turn replies, *inter alia,* that neither it nor the Big Ten has instructed the University to cancel financial aid to the student-athletes here involved. The pertinent Big Ten rules are not included in the record, and the entire issue can properly be resolved, if it need be resolved at all, only on the basis of a more developed factual record.

23. See *Bishop v. Wood,* 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Paul v. Davis,* 424 U.S. 693, 96 S.Ct. 1155, 47 L.Ed.2d 405 (1976).

24. The Association's contention that the University was obligated to declare Winey and Saunders ineligible as early as March 4 rests primarily on the fact that the University on

that date accepted the findings of Confidential Report No. 111(35), which listed violations of Association rules by Winey and Saunders as well as Thompson. See Part I(F) of this opinion, *supra.* (The Association presumably omitted Thompson from the finding in Part I–A–1 of Confidential Report No. 118(42) because the University was on March 4 under state court order not to declare Thompson ineligible until an additional hearing had been held). The obvious controversy over finding I–A–1 is that, while the University did on March 4 accept the findings of Confidential Report No. 111(35), neither Winey nor Saunders had by then been afforded a hearing. However, the problem was clearly eliminated by May 4, the pertinent date under finding I–A–2 of Confidential Report No. 118(42), because hearings were by then completed.

The questionable practice cited with respect to Thompson raises a different problem, *viz.,* the University's employment of a two-tiered hearing process which delayed a University decision on the Thompson case until May 6, well beyond the March 6 close of the basketball season. Again, however, by May 4, the problem raised by this questioned delay was largely superseded by the University's refusal to declare Thompson ineligible even after the arguably over-extended hearing process had been completed.

gible after May 4, 1976, see note 15, *supra*, the additional questions potentially implicated with respect to the University's actions prior to May 4 need not now be considered.[25] Of course, to the extent that events occurring prior to May 4 have a bearing on matters as they stood on May 4, we take them into account.

### C.

Having granted, *arguendo*, what would appear to be the better part of the University's argument, we are nonetheless persuaded that the University could have declared each of the three student-athletes ineligible, consistently with the fourteenth amendment, once the hearings before CCSB and ACIA were completed. This conclusion rests largely on the fact, much disputed but easily discernible on the present record, that the factfindings of CCSB and ACIA themselves fairly disclosed infractions of Association rules by each of the three student-athletes, infractions which in each case carried the mandatory penalty of ineligibility.

A number of prefatory observations are pertinent to the conclusion just stated. First, the parties and the district court agree, as we do, that the hearings before CCSB and ACIA afforded the student-athletes, at a minimum, whatever specific procedural protections may have been required by the fourteenth amendment. *Cf. Goss v. Lopez*, 419 U.S. 565, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975). Second, there is no contention that the substantive Association rules under which the student-athletes were charged are themselves arbitrary and capricious or that the goal of amateurism which the rules purport to promote is illegitimate. *Cf. Shelton v. NCAA*, 539 F.2d 1197 (9th Cir. 1976).

▮▮▮▮ Third, Association rules (official interpretation 18 and enforcement proce-

dure 9) plainly reserve to the Association the authority to consider any mitigating circumstances and to take action on the basis thereof, leaving to the member institution the sole task of determining whether or not an infraction has occurred. In this there is no constitutional infirmity. It is seriously doubtful, in the first instance, that the fourteenth amendment imposes any substantive obligation upon the Association to provide for consideration of mitigating circumstances. In any event, the Association does provide for such consideration, and the student-athletes are permitted to attend the restoration of eligibility hearings before the Association. Appellant's brief at 40. The complete disposition of Thompson's eligibility appeal in only six days, see Part I(D) of this opinion, indicates quite forcefully that the Association takes prompt action on such matters, and the reduction of the penalty against Thompson from permanent ineligibility to ineligibility for fourteen games attests to the fact that the Association "pay[s] attention to the evidence adduced and act[s] rationally upon it." See *Buhr v. Buffalo Public School Dist. No. 38*, 509 F.2d 1196, 1203 (8th Cir. 1974). Although consideration of mitigating circumstances occurs only *after* a student-athlete is declared ineligible, the declaration of ineligibility itself necessarily follows a member institution's determination that an infraction has occurred. Due process is flexible and calls for such procedural protections as the particular situation demands. *Smith v. Organization of Foster Families*, 431 U.S. 816, 846, 97 S.Ct. 2094, 53 L.Ed.2d 14 (1977). On the facts here, it cannot seriously be maintained that the student-athletes were entitled to a consideration of mitigating circumstances prior to a declaration of ineligibility. *See Dixon v. Love*, 431 U.S. 105, 114, 97 S.Ct. 1723, 52 L.Ed.2d 172 n.10 (1977). Accordingly, the presence or absence of mitigating circumstances was irrelevant to University's task of determining whether or not infractions had occurred.

---

**25.** None of the sanctions imposed by Confidential Report No. 118(42) have any peculiar relationship to finding I–A–1 or to the Thompson questionable practice finding. All of them, as we conclude *infra*, could have been imposed solely on the basis of finding I–A–2. If the

I–A–1 or questionable practice findings should in the future achieve any independent viable significance, and there is nothing in the record to suggest that they will, that time will be soon enough to resolve the additional questions posed by those findings.

■ Finally, the Association rules under which the student-athletes were charged do not by their own terms require any actual knowledge of the infraction.[26] In this, there is no constitutional infirmity. Although due process does require that lawful punitive action can only be imposed where fair notice has been given, *Wright v. Arkansas Activities Association, supra,* 501 F.2d at 28–29; *see Bouie v. City of Columbia,* 378 U.S. 347, 351, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), there is no general requirement, even in criminal cases, that the charged party actually knew at the time of the offense or infraction that the conduct was proscribed. *Shevlin-Carpenter Co. v. Minnesota,* 218 U.S. 57, 68–70, 30 S.Ct. 663, 54 L.Ed. 930 (1910); *United States v. Bryza,* 522 F.2d 414, 423 (7th Cir. 1975), *cert. denied,* 426 U.S. 912, 96 S.Ct. 2237, 48 L.Ed.2d 837 (1976); *cf. Lambert v. California,* 355 U.S. 225, 78 S.Ct. 240, 2 L.Ed.2d 228 (1957). Accordingly, the presence or absence of such knowledge on the part of Thompson, Winey and Saunders was irrelevant to the University's task of determining whether or not infractions had occurred.

■ Both CCSB and ACIA acknowledged Thompson's own admission that he had sold his two complimentary season tickets, with a face value of $78, for $180. Indeed, that basic fact has never been disputed by anyone. While such conduct is admittedly not the most blatant example of professional conduct by a student-athlete, we agree with the initial December 9, 1975,

view of ACIA itself that it is a clear violation of Association rules. Specifically, it is fairly embraced within the terms "used his athletic skill for pay" and "extra benefits not made available to members of the student body in general" as employed in Association constitution 3–1–(a)–(3) and 3–1–(g)–(6), respectively.[27] These provisions: (1) are the ones under which Thompson was charged; (2) have been in effect at all times material; and (3) require a declaration of ineligibility upon a finding of violation. On these facts neither Thompson nor the University through him can successfully maintain that the Association failed to give fair warning, in language that the common world understands, of what would result if Thompson sold the tickets at more than face value. *Cf. Wright v. Arkansas Activities Ass'n, supra* at 28–29. Had the University declared Thompson ineligible on May 4, 1976, it would have done so consistently with due process.

■ CCSB and ACIA similarly acknowledged Winey's admission that he accepted two invitations to Paul Johnson's Wisconsin cabin, that the visits included lodging, meals and entertainment, and that arrangements for the first visit were made through assistant basketball coach Wilson. Such conduct, however seemingly innocent, is nevertheless fairly understood as within the terms "extra benefits not made available to members of the student body in general" under Association constitution 3–1–(g)–(6).[28] That provision: (1) is the

---

**26.** In their *amici* brief, Thompson, Winey and Saunders argue to the contrary based on Association constitution 3–9–(e), which requires ineligibility in *all* sports where certain violations are knowing and willful or involve gross dishonesty. The argument is without merit. Thompson, Winey and Saunders were charged under Association rules which are logically and textually independent of constitution 3–9–(e), which have no such requirements, and which (with the possible exception of constitution 3–4–(a)) require ineligibility only in the sport which occasions the violation. See notes 2–4 and 13, *supra.*

**27.** ACIA concluded there was no valid *express* prohibition against the sale of complimentary tickets for more than face value until January 1975, one month after Thompson's sale. Even

if. true, this would not affect our conclusion that such sales were fairly proscribed by the more general provisions of Association constitution 3–1–(a)–(3) and 3–1–(g)–(6).

Although not essential to our decision, it is significant that Thompson had, prior to his sale, signed a Big Ten statement that complimentary ticket sales would subject him to conference ineligibility. See note 5, *supra.* There is a strong argument that this statement was sufficient to put him on at least inquiry notice that similar conduct would warrant a similar sanction under Association rules.

**28.** ACIA's stated position that it is common practice for faculty and friends of the University to invite students, both athletes and non-athletes, to their homes ignores the fact that the arrangements for Winey's first visit were, as

one under which Winey was charged; (2) has been in effect at all times material; and (3) when read in conjunction with Association constitution 3–1–(a)–(3), requires a declaration of ineligibility upon a finding of violation. On these facts neither Winey nor the University through him can successfully maintain that the Association failed to give fair warning, in language that the common world understands, of what would result if Winey accepted such invitations. *Cf. Wright v. Arkansas Activities Ass'n, supra* at 28–29. Had the University declared Winey ineligible on May 4, 1976, it would have done so consistently with due process.

We reach a similar conclusion with respect to two of the three charged infractions against Saunders.[29] CCSB and ACIA found that Saunders had on three occasions accompanied assistant coach Wilson to a downtown Minneapolis office and there placed between two and six telephone calls to his parents on a WATS line. They also found that Saunders was afforded cost-free overnight lodging at Gustavus Adolphus College while attending head basketball coach Musselman's summer basketball camp. Again, we would not label such ac-

tivities as particularly serious breaches of Saunders' amateur status. Nevertheless, the use of the WATS line to place calls to his parents is fairly understood as within the terms "extra benefits not made available to members of the student body in general" under Association constitution 3–1–(g)–(6),[30] and the overnight lodging is similarly understood as within either the same terms of constitution 3–1–(g)–(6) or the terms "financial assistance other than that administered by his institution" under Association constitution 3–4–(a), depending upon whether the lodging was furnished through the University's athletic department or through Gustavus Adolphus, respectively.[31] These provisions: (1) are the ones under which Saunders was charged; (2) have been in effect at all times material; and (3) require a declaration of ineligibility upon a finding of violation. On these facts neither Saunders nor the University through him can successfully maintain that the Association failed to give fair warning, in language that the common world understands, of what would result if Saunders accepted such benefits. *Cf. Wright v. Arkansas Activities Ass'n, supra* at 28–29.

---

ACIA found, initiated by an assistant basketball coach. Accordingly, that visit at least could fairly have been understood as an extra benefit not available to members of the student body in general.

29. It is open to question whether, under the findings of CCSB and ACIA, Saunders' use of Mrs. Kienzel's automobile could reasonably have been understood as a violation of Association constitution 3–1–(g)–(6) as charged. Those findings reflect that Saunders had known Mrs. Kienzel for about ten years. They do not reflect that University personnel were responsible for the arrangements to use the car. In view of our conclusion with respect to the two remaining violations charged against Saunders, however, we need not resolve whether Saunders' use of the automobile could, under the findings of CCSB and ACIA, reasonably have been understood as proscribed.

30. CCSB and ACIA concluded that the purpose of the telephone calls to Saunders' parents was to recruit basketball players and CCSB noted "[t]he extent to which the telephone calls to the Saunders family were social or personal could not be determined from the available evidence." Particularly in view of the admitted laxness with which University athletic person-

nel enforced Association rules generally, it strains credulity to suggest that a student's calls to his parents would be confined to recruiting matters. This is not a criminal case in which an offense must be proved beyond a reasonable doubt, and we can discern no conceivable constitutional impediment to placing upon the student the burden of going forward with evidence that admitted phone calls to his parents were confined to nonpersonal matters. *Cf. Barnes v. United States*, 412 U.S. 837, 846 n.11, 93 S.Ct. 2357, 37 L.Ed.2d 380 (1973).

31. The findings of CCSB and ACIA do not make clear who furnished the lodging. ACIA concluded "there was no violation because the evidence provided no grounds for asserting that free room had been made available to a student-athlete that was not also available to a student who was not an athlete. . . ." Again, it strains credulity to suggest that a college dormitory is generally open, cost-free, to students from another college or university. The burden of going forward with evidence that in this case it was could constitutionally have been placed upon Saunders. See note 30, *supra*.

Had the University declared Saunders ineligible on May 4, 1976, it would have done so consistently with due process.

## D.

■ The conclusions just reached are, in our opinion, dispositive of the University's claim of unconstitutional interference. Arguably, our decision in *Brewer v. Hoxie School Dist. No. 46, supra,* might support the University's position if the Association had in fact insisted that the University take actions which the Constitution prevented it from taking. If, for instance, the factfindings of CCSB and ACIA had genuinely reflected that the charged infractions against Thompson, Winey and Saunders were unfounded, we would at least be confronted with a different set of problems. Here, however, the actions which the Association insisted the University take were, as we have concluded, consonant with the Constitution. There was accordingly no superior constitutional duty preventing the University from honoring its contractual obligation to declare the three student-athletes ineligible, and the penalties imposed by Confidential Report No. 118(42) were the legitimate consequence, unimpaired by the Constitution, of the University's breach of contract.

The determination of the district court that CCSB and ACIA reached "justifiable conclusions" is beside the point. It is of course true that, apart from the conditions and obligations of membership assumed by the University, it was free to consider mitigating circumstances and to make an unfettered determination on eligibility matters. But the University is without question bound by those conditions and obligations, at least to the extent that they do not dictate actions proscribed by the Constitution. Here, factfindings ascertained in procedures which unquestionably afforded due process reflected conduct reasonably understood as proscribed and reasonably understood as mandating ineligibility. Thus, the conclusions of CCSB and ACIA that no violations had occurred and that any arguable violations were substantially mitigated, however "justifiable" they might have been in the absence of the University's contractual obligations to the Association, were not constitutionally privileged in the sense that the fourteenth amendment compelled them. Under these circumstances, the Constitution does not interdict the Association's insistence that its interpretation of the rules prevail, and, once the Association did so insist, the University was obligated to declare the student-athletes ineligible in accordance with Association constitution 4–2–(a) and official interpretation 18.[32]

Finally, we disagree with the district court's determination that the University was bound to abide by its decision not to declare the student-athletes ineligible. Beyond noting that a failure so to abide would "make a mockery of due process", the district court does not articulate the basis of this determination. For the reasons stated above, we are unable to discern any mockery of due process.[33]

---

**32.** Moreover, the factual predicate for the penalty of ineligibility having been established by the findings of CCSB and ACIA, it was not necessary that an additional hearing be held. In *Dixon v. Love, supra,* 431 U.S. at 113–114, 97 S.Ct. at 1728, which upheld certain procedures for revocation of a driver's license, the Supreme Court stated:

> Since appellee does not dispute the factual basis for the Secretary's decision, he is really asserting the right to appear in person only to argue that the Secretary should show leniency and depart from his own regulations. Such an appearance might make the licensee feel that he has received more personal attention, but it would not serve to protect any substantive rights.

(Footnote omitted). Here too, where the factfinding task had already been meticulously accomplished, an additional hearing would not have served to protect any substantive rights. *See also Appalachian Power Co. v. Environmental Pro. Agcy.,* 477 F.2d 495, 501 (4th Cir. 1973); *Anti-Defamation League v. Federal Communications Comm'n,* 131 U.S.App.D.C. 146, 403 F.2d 169, 171 (1968), *cert. denied,* 394 U.S. 930, 89 S.Ct. 1190, 22 L.Ed.2d 459 (1969).

**33.** In their *amici* brief, Thompson, Winey and Saunders argue, under Minnesota administrative law, that principles of res judicata prevented the University from reversing its decision not to declare them ineligible. *See Brix v. General Accident & Assur. Corp.,* 254 Minn. 21, 93 N.W.2d 542 (1958); *Anchor Cas. Co. v.*

We well appreciate that our decision leaves the Association's member institutions with the sometimes delicate task of declaring individuals ineligible when facts are found which reasonably reflect proscribed conduct and with not declaring them ineligible when such facts are not found. We cannot say that this task will always be an easy one, nor can we deny that the member institution will occasionally find itself in a position where fairness to the individual and adherence to contractual obligations may seemingly conflict. We also appreciate that the violations with which at least Winey and Saunders were charged were minor violations and that even Thompson's violation was not particularly serious. Nor have we discovered any basis for doubting the University's good faith belief that the Association was in fact penalizing it for affording Thompson, Winey and Saunders what the University genuinely believed to be required by the fourteenth amendment.

On the other hand, the Association seeks to vindicate its own authority to interpret its own rules, an authority which we agree is of the utmost importance to the execution of the Association's salutary goals. In addition, we do not view the Association's dealings with the University as unduly harsh or abusive. The Association has stated at least twice that the penalties of Confidential Report No. 118(42) will be reconsidered and reduced or eliminated once the University complies with its conditions and obligations of membership. The Association has similarly stated, at least twice, that procedures for consideration of mitigating circumstances remain open with respect to all three student-athletes, again provided that the University first complies with its conditions and obligations of membership.

The very record before us attests to the fact that those procedures afford meaningful consideration, for the Association has already once reduced the penalty against Thompson to ineligibility for fourteen games. We would certainly suspect that utilization of those procedures would result in a similar reduced penalty for Thompson and, due to the lesser nature of their violations, even more largely reduced penalties for Winey and Saunders.

The remarks in the two preceding paragraphs are of course irrelevant to our decision. Our authority is confined to adjudicating the constitutional issue before us, and apart from that issue we have no authority to judge whether a voluntary association has chosen the most desirable or efficacious means of enforcing its rules. *Shelton v. NCAA*, 539 F.2d 1197, 1198 (9th Cir. 1976). Here, we have discerned no unconstitutional interference of the type alleged, and with that conclusion our inquiry necessarily ends.

We hold that the University has not demonstrated a substantial likelihood of success on the merits and that the district court accordingly erred in granting the preliminary injunction herein appealed.

The preliminary injunction issued by the district court on December 2, 1976, is dissolved. The cause is remanded to the district court for further proceedings not inconsistent with this opinion. Our mandate shall issue forthwith.

Reversed.

BRIGHT, Circuit Judge, concurring:

Although I have some doubt that the activities of the NCAA constitute "state

*Bongards Co-op. Creamery Ass'n*, 253 Minn. 101, 91 N.W.2d 122 (1958). Even if the *amici* were correct in this argument, we would have considerable difficulty understanding how it follows that the Association has interfered with a duty imposed on the University by the federal Constitution, cf. *Brewer v. Hoxie School Dist. No. 46, supra*, or that the University otherwise has a claim against the Association. In any event, a proper application of res judicata necessarily entails that the allegedly binding decision is a final one. *Brix v. General Accident &*

*Assur. Co., supra*, 93 N.W.2d at 545–46. Here, all parties well knew that the University's decision was subject to accommodation with the Association's demands and that the only final decision which could be rendered was either one in which the Association acquiesced or, absent such acquiescence, one specifically upheld by a court judgment itself final. When the University made its decision in May 1976, no one could reasonably have thought that the matter was closed.

action," four other circuits have held to the contrary and I feel bound by those precedents.[34]

However, I believe an additional observation is warranted. In my judgment, the ruling of the Association visits the sins of the "fathers" (the University's basketball coaches) upon the relatively innocent "sons" (the basketball players). The obvious injustice of the NCAA rulings indirectly affecting the athletes in question seems to reflect some degree of vindictiveness, not necessarily against the student athletes, but against the University of Minnesota, to punish it for the previous improprieties of the basketball coaching staff.

The University of Minnesota, we assume, retains the prerogative of dropping its membership in the NCAA although such remedy may be impractical in this era of college athletic competition, which through exhibition on television under NCAA arrangements produces financial rewards and other benefits for the member colleges and universities.

Although the rulings of the NCAA indirectly require that the University of Minnesota inflict upon the athletes in question punishment which seems grossly disproportionate to the offense committed by each of them, this court lacks the power in this case to redress the apparent moral wrong absent a constitutional violation.

---

**34.** *Rivas Tenorio v. Liga Atletica Interuniversitaria*, 554 F.2d 492 (1st Cir. 1977); *Howard University v. NCAA*, 166 U.S.App.D.C. 260, 510 F.2d 213 (1975); *Parish v. NCAA*, 506 F.2d 1028 (5th Cir. 1975); *Associated Students, Inc. v. NCAA*, 493 F.2d 1251 (9th Cir. 1974). However, cases such as *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) and *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972) could support a strong argument that no state action exists.