Carolyn F. HUNTER, Ph.D., Plaintiff,

v.

Dr. Harry WARD and Dr. Thomas A. Bruce, Chancellor and Dean, Respectively, of the University of Arkansas School of Medicine, Defendants.

No. LR-C-79-352.

United States District Court,
E. D. Arkansas, W. D.

Sept. 7, 1979.

John W. Walker, Little Rock, Ark., for plaintiff.

David A. Stewart, Fayetteville, Ark., for defendants.

## MEMORANDUM OPINION

ROY, District Judge.

The plaintiff in this case, Dr. Carolyn F. Hunter, a black female, has moved to preliminarily enjoin the defendants, officials of the University of Arkansas School of Medicine, from denying her employment as an instructor on the basic sciences faculty of the school for alleged racially and sexually discriminatory reasons. The plaintiff seeks to invoke the jurisdiction of this court pursuant to the provisions of 42 U.S.C. §§ 1981, 1983 & 2000e *et seq.*, and 28 U.S.C. § 1343(3) & (4). On August 17, 1979, the court conducted an evidentiary hearing with regard to plaintiff's application for preliminary injunctive relief. At the close of the evidence the court ruled from the bench that the plaintiff's motion would be granted and that the defendants would be preliminarily enjoined to employ the plaintiff in the position of instructor at the University of Arkansas School of Medicine in the Department of Biochemistry. The court informed the parties at that time that its formal findings and order would be entered at a later date. This opinion is submitted in lieu of separate findings of fact and conclusions of law as the court's memorandum of decision pursuant to the provisions of Rule 52(a) of the Federal Rules of Civil Procedure.

Dr. Carolyn Frances Hunter is a citizen of the United States and a life long resident of the State of Arkansas. Dr. Hunter has lived in other States during the course of her educational pursuits but currently re-

sides in Arkansas. Her parents reside in Fairview, Arkansas, a community situated approximately eighty-five (85) miles south of Little Rock. Dr. Hunter attended Sparkman High School in Sparkman, Arkansas from 1966 through 1970. Upon graduation from high school Dr. Hunter enrolled at Henderson State College in Arkadelphia, Arkansas. Dr. Hunter graduated from Henderson State College in 1974, receiving a Bachelor of Science degree from that institution. During the course of her graduate studies, Dr. Hunter attended the University of Arkansas at Fayetteville for a brief period of time and continued her graduate work at Oklahoma State University in Stillwater, Oklahoma. Dr. Hunter received a Ph.D. degree from the latter institution in 1978. During her tenure as a graduate student at Oklahoma State University, Dr. Hunter maintained an overall grade point average of 3.10 out of a possible grade point average of 4.0 and a 3.5 grade point in her major field of study, biochemistry. Dr. Hunter has engaged in post-doctorial studies at Purdue University where she actively researched cholesterol biosynthesis and the relationship of cholesterol to coronary artery disease. Her current research interests center around the treatment and cure of sickle-cell anemia, a disease which is most prevalent among members of her own race.

Dr. Hunter has approximately five years of research experience. She has worked as a chemistry laboratory assistant at both Henderson State University and Oklahoma State University. She has also worked as a chemist for the Camden Paper Company in Camden, Arkansas and as a biochemist for Phillip's Petroleum Company in Bartlesville, Oklahoma. There is no serious dispute that Dr. Hunter is amply qualified in her chosen field of biochemistry. Indeed, the defendants have so acknowledged in their testimony before this court.

One of the defendants in this case, Dr. Harry Ward, is the Chancellor of the University of Arkansas School of Medicine. Dr. Ward's association with the University of Arkansas is of recent origin inasmuch as his present employment with the University commenced in March of this year. The other named defendant, Dr. Thomas A. Bruce, is the Dean of the School of Medicine. Each of these individuals are responsible for the appointment or employment of faculty members at the University of Arkansas' College of Medicine. Dr. Bruce, for example, as part of his duties as Dean of the College of Medicine, makes recommendations with regard to the appointment of faculty members to the Chancellor of the University of Arkansas Medical Sciences Campus. The Chancellor, Dr. Ward, as part of his official duties, makes recommendations for the appointment of faculty members to the University's Central Administration, the President of the University of Arkansas and, ultimately, the Board of Trustees.

The customary or usual method of employing a faculty member at the University of Arkansas College of Medicine is as follows: (1) the prospective faculty member participates in interviews with the senior faculty members of the particular department in which employment is sought; (2) the prospective faculty member or applicant interviews with the chairman of the relevant department; (3) after the interview process has run its course, the chairman or head of the department may or may not consult with other faculty members; (4) in some cases the applicant may have an additional interview with the Dean; (5) the actual appointment process is initiated by a recommendation from the chairman of the department involved to the Dean of the College of Medicine; (6) the Dean makes a recommendation to the Chancellor; (7) the Chancellor makes a recommendation to the Central Administration; (8) the recommendation of the relevant officials in the Central Administration office is then forwarded to the President of the University who in turn conveys his recommendation to the Board of Trustees of the University of Arkansas. The Board then takes whatever action it considers appropriate, action which may or may not include the issuance of a "Notice of Appointment". The procedures outlined above are, of course, general in

nature and are, by no means, cast in concrete. Thus, while most of the employment decisions follow the general pattern, procedures may vary somewhat in individual cases. It is apparent to the court, from the testimony submitted at the evidentiary hearing in this cause, that the upper level administrators in the University system, the Dean, Chancellor, Vice-President, President and, ultimately, the Board of Trustees, rely heavily on the recommendations of department heads or chairmen with regard to the appointment of faculty members. Thus, in the usual course of events, if a position is offered to an applicant at the University of Arkansas School of Medicine, it is normally the position suggested or recommended by the particular department head involved.

The plaintiff contends that she was denied employment as an instructor in the Biochemistry Department of the University of Arkansas School of Medicine because of her race and sex. She further contends that University officials, more particularly, Dr. Charles L. Wadkins, the Chairman of the Biochemistry Department at the University of Arkansas Medical Sciences campus did not extend professional courtesies to her or treat her in a manner commensurate with her station in the academic community. The latter contentions are based on Dr. Wadkins' alleged failure to either take the plaintiff to lunch or to arrange for her lunch during her visits to the School of Medicine's Little Rock campus and to assist the plaintiff in meeting with a sickle cell anemia research team at the Veteran's Administration Hospital in Little Rock. The plaintiff intimates that Dr. Wadkins' alleged failure to assist her in meeting with the research team at the V.A. hospital, knowing her unfamiliarity with the metropolitan Little Rock area, provides evidence of a pattern of discriminatory treatment.

The defendants contend that the plaintiff has not sustained her burden of proof with respect to showing a substantial likelihood of success at trial on the merits and irrepa-

rable harm. The defendants' argue, *inter alia*, that: (1) the plaintiff was never guaranteed a job as an instructor in the biochemistry department; (2) the plaintiff never signed a contract or was offered a contract as an instructor in the biochemistry department at the University of Arkansas School of Medicine; (3) the plaintiff, while a qualified biochemist and an experienced researcher, has little, if any, teaching experience; (4) the plaintiff's initial application for employment at the University of Arkansas School of Medicine's personnel office was as a researcher or research assistant; (5) the plaintiff does not intend to pursue a teaching career but intends instead to enroll, assuming she meets eligibility requirements, in the University of Arkansas School of Medicine for the purpose of pursuing a medical career; (6) the defendants have offered the plaintiff a position as a research assistant in the department of biochemistry[1]; (7) the position of research assistant is a faculty position as is the position of instructor; and (8) the positions of research assistant and instructor are both non-tenured faculty positions and both pay the same salary.

The court finds that it has jurisdiction of the subject matter of this action and jurisdiction to grant preliminary injunctive relief pursuant to substantive provisions of 42 U.S.C. § 1983 and its procedural counterpart, 28 U.S.C. § 1343(3) & (4). The substantive jurisdictional basis of this action, 42 U.S.C. § 1983, provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, and immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proceeding for redress."

1. As of the date of the hearing on the plaintiff's application for issuance of a preliminary injunction, the plaintiff had not formally accepted or rejected the defendants' offer of the position as research assistant in the department of biochemistry.

Since the Fourteenth Amendment's Equal Protection Clause condemns all invidious discrimination absent some compelling state interest justifying differences in treatment, one who claims that they have been denied employment on the basis of race and sex has stated a claim for relief within the meaning of § 1983 and the court, if the evidence warrants such relief, may, consistent with its obligation to remedy deprivations of constitutional rights, preliminarily enjoin employment practices which are racially and sexually discriminatory. We wish to make clear, however, that the court's jurisdiction to grant preliminary relief is based solely upon the provisions of 42 U.S.C. § 1983. We explicitly reject 42 U.S.C. § 2000e *et seq.* as a jurisdictional basis for preliminary injunctive relief where, as in this case, the plaintiff has not received a "right-to sue" letter from the Equal Employment Opportunities Commission and a private action has been filed in less than thirty days after the initial discrimination charge was lodged with EEOC. *McGee v. Purolator Courier Corp.*, 430 F.Supp. 1285, 1286–1288 (N.D.Ala.1977). Thus, even when preliminary injunctive relief is the only remedy sought, the existence and service of a properly issued "notice of right-to-sue" letter is a jurisdictional prerequisite to a private plaintiff's suit under Title VII of the Civil Rights Act of 1964. *Gradillas v. Hughes Aircraft Co.*, 407 F.Supp. 865, 869 (D.C.Ariz.1975); *Nottelson v. A. O. Smith Corp.*, 397 F.Supp. 928 (E.D. Wis.1975); *Troy v. Shell Oil Company*, 378 F.Supp. 1042 (E.D.Mich.1974), appeal dismissed as moot, 519 F.2d 403 (6th Cir. 1975); *Collins v. Southwestern Bell Telephone Company*, 376 F.Supp. 979 (E.D.Okla.1974).[2]

■ In order to justify the issuance of a preliminary injunction, the moving party, in this case Dr. Hunter, has the burden of showing both a substantial probability of success at trial and irreparable harm absent

such issuance. *Regents of University of Minnesota v. National Collegiate Athletic Association*, 560 F.2d 352, 365 (8th Cir. 1977), cert. dismissed, 434 U.S. 978, 98 S.Ct. 600, 54 L.Ed.2d 472 (1977); *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978); *Planned Parenthood v. Citizens for Community Action*, 558 F.2d 861, 866 (8th Cir. 1977); *American Train Dispatchers v. Burlington Northern*, 551 F.2d 749, 751 (8th Cir. 1977). We turn now to a consideration of the first facet of the plaintiff's burden of proof, whether the plaintiff has demonstrated a substantial probability of success at trial.

■ Late in December, 1978, the plaintiff visited Little Rock and discussed the possibilities of employment in the School of Medicine's Department of Biochemistry with Dr. Wadkins, the chairman of the department. Dr. Wadkins informed the plaintiff that there would probably be a position open in early 1979 but the position would have to be advertised in accordance with University policies. Dr. Wadkins further informed the plaintiff that the University of Arkansas School of Medicine was interested in obtaining black faculty members, particularly, because of difficulties that black medical students had experienced during their first semesters in medical school. Dr. Wadkins interviewed the plaintiff and took information concerning her education, work experience and her telephone number at Purdue University. The evidence is in conflict with respect to further communications between the plaintiff and Dr. Wadkins during January and February, 1979. Dr. Hunter testified that she made several attempts to telephone Dr. Wadkins at his office during these months but was always informed that he was out of town or out of the office. Dr. Wadkins, on the other hand, testified that he never received any communications from the plaintiff during this particular period. In any

2. The United States Supreme Court has previously held that both the timely filing of a charge of employment discrimination and the receipt and timely action thereupon of the EEOC's statutory notice of the right to sue are the "jurisdictional prerequisites to a federal action" by an individual under Title VII. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 798, 93 S.Ct. 1817, 1822, 36 L.Ed.2d 668 (1973).

event, Dr. Hunter resumed communications with Dr. Wadkins in the middle part of January, 1979, when she mailed her resume to him. The cover letter which accompanied the copy of the plaintiff's resume made reference to previous unsuccessful attempts to contact Dr. Wadkins by telephone. Additional meetings between the plaintiff and Dr. Wadkins were held in March of 1979. During these meetings Dr. Hunter and Dr. Wadkins discussed the future availability of faculty positions in the department of biochemistry at UAMS and Dr. Hunter's research interests. As a result of these discussions Dr. Wadkins made an appointment for the plaintiff to visit with a Dr. Padilla, a member of the sickle cell anemia research team at the Veteran's Administration Hospital in Little Rock. Dr. Hunter failed to keep the appointment. Dr. Hunter attributed her failure in this regard to her unfamiliarity with the Little Rock area.[3] One or two weeks later the plaintiff met with Dr. Wadkins again to pursue the matter further. Another appointment was arranged at the Veteran's Administration Hospital with a Dr. Straub. The plaintiff again failed to keep the appointment. Between the months of March and June, 1979, there were no further communications between the plaintiff and Dr. Wadkins. The plaintiff testified that this lack of communication led her to believe that Dr. Wadkins has lost interest in her and that he was not going to hire her. In July of 1979 the plaintiff returned to the University of Arkansas School of Medicine for the purpose of applying for admission as a medical student. While discussing the application process with a Mr. Gaddy, an Assistant for Minority Affairs at the School of Medicine, the plaintiff was informed that Dr. Wadkins had announced in a faculty meeting that the plaintiff had been hired as a member of the department of biochemistry faculty. The plaintiff had also applied for employment at the University of Arkansas Medical Sciences campus through the personnel office during this visit on July 5, 1979. At some point in time between July 5th and July 12th Dr. Wadkins telephoned Dr. Hunter and informed her that he had been trying to reach her by phone. Dr. Hunter made inquiry with respect to whether there would be a position open in the department of biochemistry. Dr. Wadkins informed Dr. Hunter that he felt a position would be available for her. The next meeting between Dr. Hunter and Dr. Wadkins took place on July 12, 1979. While it is apparent from the evidence that some discussions took place with regard to the employment of the plaintiff, the evidence is conflicting on precisely what was said and

**3.** The plaintiff has attempted to assign responsibility for her admitted failure to keep the appointment with Dr. Padilla to Dr. Wadkins. The plaintiff has contended that the appointment was arranged around lunch time, that Dr. Wadkins knew she was unfamiliar with Little Rock, that Dr. Wadkins made no effort to arrange lunch for her and that in all the plaintiff's previous experiences no university official had failed to assist her in meeting appointments or arranging to take her to lunch. We view these contentions as subtle intimations of Dr. Wadkins' alleged discriminatory treatment of her. We must flatly reject this particular line of argument. Indeed, if the plaintiff required such assistance we would find it necessary to reassess the plaintiff's competence to assume the teaching responsibilities which by this action she asks this court to bestow upon her. We find it inconceivable that a person possessing the plaintiff's intellect, education and experience would require "assistance" in meeting appointments. We are equally unimpressed with

the plaintiff's suggestion that Dr. Wadkins discriminated against her or mistreated her by not taking the plaintiff to lunch or arranging for her lunch. While such conduct on the part of Dr. Wadkins may indicate a lack of professional courtesy, the plaintiff is in no position to complain in view of her record with regard to the keeping of appointments. As a matter of human experience, one can expect to be treated in the same manner in which they treat others. In the opinion of the court, a simple rule familiar to all from their childhood years provides the most appropriate solution to the plaintiff's argument, "Do unto others as you would have them do unto you". Furthermore, while Congress has seen fit to vastly expand the jurisdiction of Federal courts in recent years, we have not yet undertaken the business of reviewing individual decisions or preferences with respect to luncheon companions. Indeed, we do not perceive such trifling matters as even remotely related to any substantial federal question.

done by the parties at this particular meeting. Dr. Hunter testified that Dr. Wadkins offered her a position as an instructor, a position which would entail teaching biochemistry to medical students, supervising clinical correlation groups and performing research in conjunction with a senior faculty member. Dr. Hunter further testified that she accepted the position of instructor as soon as Dr. Wadkins offered the position to her. Dr. Wadkins, on the other hand, testified that no contract for the position of instructor had been formally extended to the plaintiff. Dr. Wadkins further testified that a contract for the position of instructor could not be offered to the plaintiff until she met and interviewed with the senior faculty members of the department of biochemistry and Dr. Bruce, the Dean of the School of Medicine. Neither of these steps, according to Dr. Wadkins' testimony, had been completed by the plaintiff on July 12, 1979. We find from the evidence before the court that Dr. Wadkins told the plaintiff, during the course of their meeting on July 12, 1979, that she would be hired as an instructor in the School of Medicine's department of biochemistry. We find it unnecessary to resolve the issue of whether a contract was formally extended to the plaintiff on July 12, 1979. Under established principles of contract law, once there has been an offer and an acceptance of the offer a binding contractual relationship exists. And the agreement of the parties need not be reduced to writing in order to be enforceable unless the contract falls within one of the classes of contracts covered by the Statute of Frauds. We further find that Dr. Wadkins and Dr. Hunter agreed that Dr. Hunter's employment in her new position would commence on July 30, 1979.

On July 30, 1979, the plaintiff reported for work at the University of Arkansas School of Medicine at 8:15 a. m. The plaintiff went to Dr. Wadkins' office to find out where her own office would be located. Dr. Hunter testified that Dr. Wadkins verbally chastised her for showing up whenever she

desired and for not keeping appointments he had arranged for her. After this incident, which took place in the presence of at least one secretary, Dr. Wadkins informed Dr. Hunter that he had appointments, that he was busy and didn't have time to talk. Dr. Wadkins then walked out of the office according to Dr. Hunter's testimony. Dr. Wadkins acknowledged in later testimony that he was angry because of the plaintiff's actions and that he expressed his feelings to the plaintiff. He denied, however, that he verbally berated the plaintiff. Members of the faculty of the department of biochemistry that talked to Dr. Hunter after this incident, most notably, Dr. Yeh, testified that Dr. Hunter appeared to be upset or emotionally distressed by the confrontation with Dr. Wadkins. The next day, July 31, 1979, the plaintiff had an appointment with Dr. Wadkins. Even though the plaintiff requested to be placed on the payroll immediately at this meeting, Dr. Wadkins advised her that this could not be done for three or four weeks because he had not executed the appointment papers for Dr. Bruce to sign. Dr. Wadkins did, however, advise the plaintiff that she could be placed on the payroll immediately if she accepted a position as a research assistant, an offer which Dr. Hunter flatly rejected. Dr. Hunter met with Dean Bruce the next day for the purpose of discussing her placement on the School of Medicine's payroll. At this meeting Dean Bruce informed the plaintiff, following a telephone call to Dr. Wadkins, that Dr. Wadkins had not executed the necessary appointment papers because the plaintiff had never provided Dr. Wadkins with a detailed resume known as a curriculum vitae, a requirement which was apparently never made known to the plaintiff before. Dr. Bruce also informed the plaintiff that she had made all of the wrong moves and advised her that she would probably have a poor relationship with Dr. Wadkins if she chose to remain in her position. On August 2, 1979, the plaintiff received a letter from Dr. Wadkins offering her a position as a research assistant, a position which would pay the same as the position of in-

structor but which would involve little, if any, teaching responsibilities in comparison with the instructor's position.[4] The defendants have not offered, and apparently do not intend to offer, the plaintiff a position as an instructor in the department of biochemistry.

■ At the outset, we must determine whether the plaintiff was not employed as instructor in the department of biochemistry because of her race or sex or both. The resolution of this question, in turn, necessarily depends on an assessment of the motives of Dr. Wadkins. If we were to view this case in isolation, we would have no difficulty in resolving the motivational factors in favor of the defendants. We cannot, however, take such a narrow view of this case without disregarding logic and the stark reality of employment statistics at the University of Arkansas School of Medicine. It is undisputed fact that the University of Arkansas School of Medicine is the only medical school in the State of Arkansas. It is also undisputed that the School of Medicine has never had a black person as a full-time member of its basic sciences faculty. Indeed, the University of Arkansas School of Medicine has never had a black professor, assistant professor or instructor on its faculty. Also, as a matter of statistical fact, the number of female faculty members is remarkably small, a situation which is aggravated by the additional fact that there were no female faculty members of professional rank prior to 1978. In sum and substance, the relevant employment data suggests that the faculty at the University of Arkansas School of Medicine has been traditionally dominated by white males. University officials appearing before this court in this and other cases have routinely voiced the University's commitment to equal employment opportunity. They have consistently argued that the actual numbers are misleading because of the exceptionally small pool of women and blacks who are qualified to fill the various faculty positions. This latter fact was stressed by Dr. Wadkins when he testified that there were only 13 black members in the American Society of Biochemists out of a total membership of several thousand. University officials have also contended that the competition for qualified blacks and women is fierce among institutions of higher learning. If all of these assertions are true, and we have no reason to suspect that they are not true, the defendants' treatment of the plaintiff appears to be quite inconsistent with their verbal commitment to equal employment opportunity. If, as a matter of fact, a qualified black biochemist is such a rarity, it would appear that the employment of Dr. Hunter as an instructor would have presented an irresistable prize, for not only is she a qualified biochemist, but she is black, a female and a native Arkansan. Dr. Wadkins recognized these attributes when he testified that "he was turned on" by the prospect of hiring Dr. Hunter. We seriously question the veracity of this testimony in light of subsequent developments and the manner in which the plaintiff was treated. We can only conclude that the hard evidence of employment statistics at the University of Arkansas' School of Medicine suggests that the School's commitment to fair employment practices is more verbal than actual. We further find that the plaintiff was denied employment as an instructor in department of biochemistry on account of her race and sex and that the plaintiff has sustained her burden of showing a probability of success on the merits at trial.

We must also disagree with the defendants' contention with regard to the plaintiff's alleged failure to establish irreparable harm. The harm in this case does revolve

---

4. Dr. Hunter testified at the evidentiary hearing on her application for preliminary injunctive relief that she was not interested in a position where the primary responsibility would be research. She testified at length that she wanted to teach in order to help herself professionally and to help students. She felt that she would gain little, from a professional standpoint, by additional research experience and that a research position would offer practically no opportunity for student contact.

around financial loss or differences in job responsibilities. The harm in this case consists of the deprivation of rights secured by the Fourteenth Amendment's Equal Protection Clause and the perpetuation of discriminatory employment practices, practices which are in direct violation of the public policy and laws of the United States. We must therefore find that the plaintiff has met her burden and that a preliminary injunction should issue.